88 F.3d 1075
 42 ERC 1993, 319 U.S.App.D.C. 12, 65
USLW 2103,
26 Envtl. L. Rep. 21,477
 ENGINE MANUFACTURERS ASSOCIATION, on Behalf of Certain of
its Members, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner,
Administrator, U.S. Environmental Protection
Agency, Respondents,
Hertz Equipment Rental Corporation and Ingersoll-Rand, Intervenors.
 Nos. 94-1558 to 94-1561, 94-1564, 94-1566 to 94-1569.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 5, 1995.
Decided July 12, 1996.
 
 On Petitions for Review of Orders of the Environmental Protection Agency.
 David M. Friedland, Raleigh, NC, argued the cause and filed the brief, for petitioner National Mining Association.
 Alan H. McConnell, Raleigh, NC, argued the cause, for petitioners and intervenors Equipment Manufacturers Institute, Ford New Holland, Inc., Hertz Equipment Rental Corporation, and Ingersoll-Rand, Portable Compressor Division.
 Timothy A. French argued the cause, for petitioner Engine Manufacturers Association with whom Gary H. Baise, Washington, DC, Jed R. Mandel, Chicago, IL, and Melissa M. Thompson, Boston, MA, were on the briefs.
 Norman W. Fichthorn entered an appearance, Washington, DC, for petitioners Hertz Equipment Rental Corporation and Ingersoll-Rand.
 Naikang Tsao, Attorney, U.S. Department of Justice, Washington, DC, argued the cause, for respondents, with whom Lois J. Schiffer, Assistant Attorney General, Washington, DC, Jonathan Z. Cannon, General Counsel, Environmental Protection Agency, and Michael J. Horowitz, Attorney, Brooklyn, NY, were on the brief.
 Michael L. Terris, Senior Staff Counsel, California Air Resources Board, was on the brief, Sacramento, CA, for amicus curiae.
 Before: GINSBURG, ROGERS and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROGERS.
 Opinion concurring in part and dissenting in part filed by Circuit Judge TATEL.
 ROGERS, Circuit Judge:
 
 
 1
 Two different sets of consolidated petitions challenge two final rules on emissions from nonroad engines and vehicles adopted by the Environmental Protection Agency ("EPA") to implement sections 209(e) and 213 of the Clean Air Act, 42 U.S.C. §§ 7401-7671q (1994) ("CAA"), as revised by the amendments of 1990, Pub.L. No. 101-549, 104 Stat. 2399. Nonroad engines are internal combustion engines that are used in a wide variety of off-highway equipment including lawnmowers, bulldozers, and locomotives. In the first set of petitions, the Engine Manufacturers Association and others ("EMA") challenge the EPA's determination of the scope of preemption of state regulation under § 209(e). In the second set of petitions, the National Mining Association and others ("NMA") challenge the EPA's decision to regulate very large (greater than 750 horsepower) engines used in mining equipment, as well as the EPA's decision to regulate smoke, hydrocarbon, carbon monoxide, and particulate matter emissions, under § 213. Finding the EPA's interpretations of § 209(e) to be permissible with one exception, we grant the EMA petitions only in part. Concluding that the EPA's regulatory actions under § 213 were within its discretion and not arbitrary or capricious, we deny the NMA petitions.
 
 I.
 
 2
 The Clean Air Act Statutory Scheme. The CAA makes "the States and the Federal Government partners in the struggle against air pollution." General Motors Corp. v. United States, 496 U.S. 530, 532, 110 S.Ct. 2528, 2530, 110 L.Ed.2d 480 (1990). The basic structure of this partnership has not changed since it was established by the Air Quality Act of 1967, Pub.L. No. 90-148, 81 Stat. 485 ("1967 Act"), and the Clean Air Amendments of 1970, Pub.L. No. 91-604, 84 Stat. 1676 ("1970 amendments"). See generally American Petrol. Inst. v. Costle, 665 F.2d 1176 (D.C.Cir.1981), cert. denied, 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982). The 1967 Act required the states to set ambient air quality standards for each air quality control region, establishing permissible levels of concentration for various pollutants.[1] Congress also directed the states to adopt implementation plans explaining how they would improve the air quality to meet the standards they had established.[2] The 1970 amendments transferred authority to set the standards, now known as national ambient air quality standards (NAAQSs), from the states to the EPA.[3] The states were to submit state implementation plans (SIPs) for achieving the NAAQSs to the EPA for approval.[4] Thus, the states had the "primary responsibility" for improving air quality,[5] although the EPA significantly influenced the process by setting the NAAQSs and testing proposed SIPs against detailed statutory criteria.
 
 
 3
 The CAA contemplated that the states would carry out their responsibility chiefly by regulating stationary sources, such as factories and power plants. Both before and after the 1977 amendments, Pub.L. No. 95-95, 91 Stat. 685, many of the statutory requirements for SIPs related to the regulation of stationary sources.[6] Penalties for failing to attain air quality standards also focused on stationary sources, for example by restricting construction of new stationary sources in areas that failed to meet a NAAQS.[7] When Congress considered the 1990 amendments, it did so against a history of detailed state regulation of stationary sources, backed up by the threat of curtailed construction of these economically important installations.
 
 
 4
 In contrast to federally encouraged state control over stationary sources, regulation of motor vehicle emissions had been a principally federal project. See generally Motor Vehicle Manufacturers Ass'n v. New York State Dep't of Envtl. Conserv., 17 F.3d 521, 524-27 (2d Cir.1994) ("MVMA"); Motor & Equip. Mfrs. Ass'n, Inc. v. EPA, 627 F.2d 1095, 1101-03, 1108-11 (D.C.Cir.1979) ("MEMA"), cert. denied, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). The regulatory difference is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states. Congress had another reason for asserting federal control in this area: the possibility of 50 different state regulatory regimes "raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers." MEMA, 627 F.2d at 1109. Two years after authorizing federal emissions regulations, therefore, Congress preempted the states from adopting their own emissions standards.[8] The Second Circuit has referred to this preemption as "the cornerstone" of Title II, the portion of the CAA that governs mobile pollution sources. MVMA, 17 F.3d at 526.
 
 
 5
 In spite of Congress' determination to protect manufacturers from multiple emissions standards, see MEMA, 627 F.2d at 1109 (citing S.Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) U.S.Code Cong. & Admin.News 1967, p. 1938), California was granted an exemption from the § 209(a) preemption.[9] Congress recognized that California was already the "lead[er] in the establishment of standards for regulation of automotive pollutant emissions" at a time when the federal government had yet to promulgate any regulations of its own. MEMA, 627 F.2d at 1109 n. 26 (quoting S.Rep. No. 192, 89th Cong., 1st Sess. 5 (1965) U.S.Code Cong. & Admin.News 1965, p. 983). California's Senator Murphy convinced his colleagues that the entire country would benefit from his state's continuing its pioneering efforts, California serving as "a kind of laboratory for innovation." Id. at 1109, 1110 n. 31, 1111. This function was enhanced by the 1977 amendments, which permitted other states to "opt in" to the California standards by adopting identical standards as their own.[10] Thus, motor vehicles must be either "federal cars" designed to meet the EPA's standards or "California cars" designed to meet California's standards. MVMA, 17 F.3d at 526-27. Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards under the legislative compromise embodied in § 209(a).
 
 
 6
 The pre-1990 CAA, then, extensively treated both stationary sources, which were principally a state responsibility, and motor vehicles, which were principally the shared responsibility of the EPA and California. Nonroad sources were not expressly mentioned, although it appears that some large states had started to regulate a few nonroad sources in their attempts to meet the NAAQSs.[11] It was not until the 1990 amendments that Congress chose to define and regulate nonroad sources, and it is the EPA's interpretation and application of those amendments that are challenged here.
 
 
 7
 The several phrases on whose construction these petitions turn are but tiny pieces of the 1990 amendments, a legislative feat whose massiveness and complexity "beggar[ ] description." MVMA, 17 F.3d at 525. Congress did not, however, alter the basic structures of Titles I and II, governing the federal-state partnership over attainment of the NAAQSs and control of motor vehicle emissions, respectively. Title I continues to focus both state regulatory efforts and disincentives to nonattainment on stationary sources.[12] The new permitting regime of Title V[13] and the acid rain provisions of Title IV[14] also direct the states' attention to their traditional regulation of stationary sources. Although the amendments require a clean fuel vehicles program in serious, severe and extreme nonattainment areas,[15] the thrust of state compliance efforts continues to be on stationary sources.
 
 
 8
 The mobile source provisions of Title II also continue the basic pre-1990 regime, with the amendments adding detail and refinements. See WILLIAM H. RODGERS, JR., ENVIRONMENTAL LAW: AIR AND WATER § 3.1D (Supp.1995). For the first time, however, Congress extended federal regulation under Title II to nonroad pollution sources. The amendments altered the definitional section of Title II, adding definitions of "nonroad engine"[16] and "nonroad vehicle"[17] and changing the definition of "manufacturer" to include the manufacturing or assembling of new nonroad vehicles or new nonroad engines.[18] Under § 213, the EPA was required to study emissions from nonroad sources[19] and, if statutory triggers were met, to promulgate standards for the emission of various pollutants from new nonroad sources.[20] As it had done with respect to motor vehicles, Congress not only authorized the EPA to regulate nonroad sources but also preempted state regulation. The 1990 amendments added § 209(e)(1), which expressly preempted the states from adopting standards or other requirements relating to emissions from two specific categories of nonroad sources.[21] "In the case of any nonroad vehicles or engines other than those referred to in" § 209(e)(1), the EPA was required in § 209(e)(2) to authorize California to adopt standards and other requirements relating to emissions, under similar conditions to those governing the motor vehicle preemption waiver; again, as with the motor vehicle preemption waiver, other states could then opt in to the California standards.[22]
 
 II.
 
 9
 EMA challenges three aspects of the EPA's § 209(e) rulemaking: (1) the adoption of a "showroom-new" definition of "new" under § 209(e)(1), rather than a date-certain definition; (2) the interpretation of § 209(e)(2) to preempt state regulation of only "new" nonroad engines and vehicles, rather than to preempt state regulation of all nonroad engines and vehicles, "new" and non-"new," not covered in § 209(e)(1); and (3) the interpretation of § 209(e)'s ban on state "standards and other requirements" not to reach the states' so-called "in-use" regulations.
 
 A.
 
 10
 Background of the EMA petitions. In its notice of proposed rule making for § 209(e), the EPA proposed to define "new" consistently with the statutory definition of "new motor vehicle" in § 216 of the CAA.[23] Therefore, the preemption of § 209(e)(1) would be limited to vehicles and engines for which the legal or equitable title had never been transferred to the ultimate purchaser.[24] This definition was retained in the final rule, with an amendment to cover leased vehicles and engines.[25] The final rule also limited the § 209(e)(2) implied preemption to "new" sources.[26] In this respect, the final rule differed from the notice of proposed rulemaking, which would have preempted state standards over new and non-new sources. Even though the NPRM proposed to extend the implied preemption of § 209(e)(2) to non-new sources, however, the EPA said that "[f]or engines which are no longer 'new,' states will be able to adopt regulations such as fuel quality specifications, operational mode limitations, and measures that limit the use of nonroad engines or equipment."[27] This is the genesis of the dispute over "in-use" regulations. The final rule, which limited preemption to new sources, necessarily continued to permit in-use regulations, which by definition apply only to non-new sources.
 
 
 11
 Following publication of the NPRM, EMA and other commenters argued unsuccessfully that "new" should mean either that the engine or vehicle was manufactured after the effective date of the 1990 amendments, or that the engine had yet to be rebuilt. EMA claimed that Allway Taxi Inc. v. City of New York, 340 F.Supp. 1120 (S.D.N.Y.) (interpreting § 209(a) motor vehicle preemption), aff'd, 468 F.2d 624 (2d Cir.1972), showed that the states could not regulate new motor vehicles the moment after they were purchased--even though the statute explicitly limited the preemption to showroom-new motor vehicles. Rather, state emissions controls must be sufficiently delayed from the original sale that the burden of compliance would not fall on the manufacturer:
 
 
 12
 We do not say that a state or locality is free to impose its own emission control standards the moment after a new car is bought and registered. That would be an obvious circumvention of the Clean Air Act and would defeat the congressional purpose of preventing obstruction to interstate commerce. The preemption sections, however, do not preclude a state or locality from imposing its own exhaust emission control standards upon the resale or reregistration of the automobile. Nor do they preclude a locality from setting its own standards for the licensing of vehicles for commercial use within that locality. Such regulations would cause only minimal interference with interstate commerce, since they would be directed primarily to intrastate activities and the burden of compliance would be on individual owners and not on manufacturers or distributors.
 
 
 13
 Id. at 1124. Therefore, EMA commented, even if the EPA wanted to create a parallel regime for nonroad engines and vehicles, it should not adopt a definition of "new" that ended preemption at the moment of title transfer. The EPA noted these concerns, which of course would apply equally to the statutory definition of "new motor vehicle," and stated in the final rule that it expected courts to apply Allway Taxi's reasoning to the EPA's definition of "new nonroad engine."[28]
 
 B.
 
 14
 The EMA Petitions. Before addressing the merits of the EMA petitions, we must first dispose of two procedural issues raised by the parties. First, EMA asks us to vacate the portion of the final rule limiting the implied preemption of § 209(e)(2) to new nonroad sources since the NPRM did not propose such a limitation. However, the court has long recognized that a final rule that is a "logical outgrowth" from the notice of proposed rulemaking does not violate the notice requirement of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1994).[29] See, e.g., Connecticut Light and Power Co. v. Nuclear Reg. Comm'n, 673 F.2d 525, 533 (D.C.Cir.), cert. denied, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982), and cases cited; see also Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1237-38 (D.C.Cir.1994). Here, the notice of proposed rulemaking announced that the preemption under § 209(e) was at issue. 56 Fed.Reg. at 45,866. It also announced that the EPA proposed to construe § 209(e) parallel to § 209(b) (motor vehicles). Id. at 45,869. This sufficed to imply an intention to treat the scope of preemption similarly. Under these circumstances, there is no basis for vacating this part of the rule.
 
 
 15
 The EPA, in contrast, requests that we dismiss EMA's challenge to the EPA's decision to permit states to adopt in-use regulations. The NPRM contained a sentence, quoted above, in which the EPA proposed to permit states to adopt such regulations in spite of the § 209(e)(2) preemption. None of the EMA petitioners challenged this proposal during the notice and comment period. The EPA argues that EMA is therefore precluded from challenging the in-use aspect of the final rule. Congressmen Dingell and Bruce, however, did challenge the proposal in a letter to the Administrator:
 
 
 16
 The fact that title is transferred to the ultimate purchaser and the vehicle or engine is "in use" or used does not suddenly give the States a power to impose standards or requirements relating to emission controls because of that transfer.... If such items as "fuel quality specifications, operational mode limitations, and measures that limit the use of nonroad engines or equipment" are in reality standards or requirements controlling emissions, they are not allowed any more than they were before title passed.
 
 
 17
 In the final rule, while not referring to the Congressmen's criticism on this point, the EPA discussed at length why it believed § 209(e)(2) did not preempt in-use regulations.[30]
 
 
 18
 As noted previously, the § 209(e) rulemaking is not governed by the special standards of § 307(d) of the CAA. Under the common law doctrine of exhaustion of remedies, EMA may raise the issue here, even if it did not raise it during the rulemaking itself, so long as the agency actually considered the issue. NRDC v. EPA, 824 F.2d 1146, 1150-52 (D.C.Cir.1987) (in banc). Cf. ASARCO, Inc. v. FERC, 777 F.2d 764, 773-74 (D.C.Cir.1985) (Natural Gas Act). Because the Congressmen directly challenged the agency on the very point that EMA raises in its petition for review, and the EPA defended its position at some length in the final rule, EMA is not barred from arguing the issue now. We therefore turn to the merits of the EMA petitions.
 
 
 19
 Our standard of review for both the EMA and the NMA petitions follows a familiar path. The court will uphold the EPA's final rule "[i]f EPA acted within its delegated statutory authority, considered all of the relevant factors, and demonstrated a reasonable connection between the facts on the record and its decision." Ethyl Corp. v. EPA, 51 F.3d 1053, 1064 (D.C.Cir.1995).[31] On issues of statutory interpretation, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782. Thus, the court need only find "that the EPA's understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." Chemical Mfrs. Ass'n. v. NRDC, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (Clean Water Act). See also Chevron, 467 U.S. at 848, 104 S.Ct. at 2784 (1977 CAA amendments are "lengthy, detailed, technical, complex and comprehensive"). Because EMA directs its arguments to Chevron step one, that also is the primary focus of our discussion.
 
 
 20
 1. The definition of "new." In the absence of a statutory definition, the EPA chose to define "new" in § 209(e)(1) to mean that the engine or vehicle has not been sold to the ultimate purchaser or put into use. EMA refers to this definition, which closely parallels the definition of "new motor vehicle" in § 216(3), as a "showroom-new" definition because it defines an engine or vehicle as no longer "new" once it has left the retail showroom. EMA maintains that Congress intended "new" to mean that the engine or vehicle was not in existence on the effective date of the 1990 amendments. Any engine or vehicle manufactured after that date-certain would therefore always be "new," even after it had been put into operation. In sum, the EPA decided that the states could not regulate the categories of equipment defined in § 209(e)(1) until it had been sold to the ultimate user, regardless of when the equipment was manufactured, while EMA believes Congress intended that the states could not ever regulate any such equipment, either before or after sale, so long as the equipment was manufactured after 1990.
 
 
 21
 Although EMA presents various reasons why the EPA's definition of "new" should not survive Chevron review, none is convincing. EMA first maintains that Congress' failure to define "new nonroad engine" and "new nonroad vehicle" compels the conclusion that these terms do not have a meaning analogous to "new motor vehicle," and "new motor vehicle engine," which are statutorily defined. Section 209(a) preempts state standards for motor vehicles: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."[32] Section 216(3) defines "new motor vehicle" as "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser" and "new motor vehicle engine" as "an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to the ultimate purchaser."[33] In the 1990 amendments, Congress added definitions of "nonroad engine" and "nonroad vehicle" to § 216, but did not define "new nonroad engine" or "new nonroad vehicle" in a provision analogous to § 216(3). EMA relies on this omission, contending that if Congress had meant "new nonroad engine" in § 209(e) to have a parallel definition to "new motor vehicle" in § 209(a), it would have inserted that definition in § 216. The EPA uses the absence of any definition of "new nonroad engine" to make the opposite point: because there was a statutory definition of "new" implicit in the longstanding definition of "new motor vehicle," if Congress had meant some other definition of "new" to apply to nonroad sources, it would have put that other definition into the statute.
 
 
 22
 Congress did amend the definition of "manufacturer" in § 216(1) to mean "any person engaged in the manufacturing or assembling of new motor vehicles, new motor vehicle engines, new nonroad vehicles or new nonroad engines."[34] Had Congress not intended "new nonroad vehicles" and "new nonroad engines" to import a similar meaning to "new motor vehicles" and "new motor vehicle engines," it would likely not have used the same modifier, especially one with a well-understood preexisting meaning in Title II. At the very least, if it had wanted a different meaning of "new" to apply within the very same phrase, it could have made its intention explicit, and it did not. See Mohasco Corp. v. Silver, 447 U.S. 807, 825, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980); Brown v. National Hwy. Traffic Safety Admin., 673 F.2d 544, 546 n. 5 (D.C.Cir.1982). Likewise, had Congress intended a date-certain definition, it could have provided an explicit trigger date for the § 209(e)(1) preemption, as it did elsewhere in Title II. E.g., CAA, § 218, 42 U.S.C. § 7553 (1994) ("The Administrator shall promulgate regulations applicable to ... nonroad engines manufactured after model year 1992."). In any event, the absence of a definition of "new nonroad engine" from § 216 does not satisfy Chevron step one by foreclosing the possibility that in Title II of the CAA "new" meant the same thing in 1990 that it always had in the past.
 
 
 23
 "New" is used in other parts of the CAA in the sense urged by EMA, most obviously in Title I in connection with the states' obligation to regulate and review the construction of "new" stationary sources. For example, § 111(a)(2) defines "new source" as "any stationary source, the construction or modification of which is commenced after the publication of regulations ... prescribing a standard of performance under this section which will be applicable to such source."[35] Thus, before 1990, "new" meant one thing with respect to stationary sources and another thing with respect to motor vehicles. By putting the regulation of nonroad sources together with motor vehicles in Title II, Congress suggested that it meant the latter definition to apply when it used "new" in relation to nonroad sources.
 
 
 24
 Nor is it mere textual proximity that leads to this conclusion. The CAA's treatment of nonroad source regulation is almost identical to its treatment of motor vehicle regulation. For instance, under § 213(d), the EPA's emissions standards for nonroad sources "shall be subject to sections [206, 207, 208, and 209] ... and shall be enforced in the same manner as standards prescribed under section ."[36] Section 202 authorizes the EPA to promulgate standards for motor vehicles, and the other cited sections establish the details of the federal regulatory program over motor vehicles, such as testing and certification. Section 213(a)(3) directs the EPA, when setting standards for nonroad sources, first to "consider standards equivalent in stringency to standards for comparable motor vehicles or engines (if any) regulated under section ."[37] Essentially, Congress regulated nonroad sources by giving the EPA the authority to set emissions standards, then simply incorporating by reference the entire enforcement and testing regime applicable to motor vehicles. This parallel treatment reinforces the EPA's conclusion that Congress meant the word "new" to mean the same thing with respect to both nonroad sources and motor vehicles.
 
 
 25
 In addition, the structure of nonroad source regulation is similar to that for motor vehicle regulation, and dissimilar to that for stationary source regulation, in that the EPA is given the principal role in setting standards and the states are preempted from intruding too greatly. There are also two explicit textual indications that Congress classified nonroad sources together with motor vehicles and distinguished them from stationary sources.[38] Thus, at best, the existence of differing meanings of "new" in the CAA makes § 209(e)(1)'s use of that term ambiguous; there is certainly no basis elsewhere in the Act for forcing the EPA to adopt EMA's preferred definition at Chevron step one.
 
 
 26
 EMA also contends that the EPA's definition would render § 209(e)(1) a "nullity" because it would apparently permit the states to regulate emissions from the moment a nonroad engine was first put into operation. The EPA correctly responds that if that were so, then the statutory definition of "new motor vehicle" would render § 209(a) a "nullity." Not only has this not happened--the preemption scheme for motor vehicles has been working for almost thirty years--but the statute cannot be said to speak to the issue involved here, and against the EPA's definition, when Congress, operating under almost identical statutory language in the motor vehicle preemption regime, expressly used a virtually identical definition of "new." The Allway Taxi interpretation, postponing state regulation so that the burden of compliance will not fall on the manufacturer, has prevented the definition of "new motor vehicle" from "nullifying" the motor vehicle preemption regime. EMA has offered no reason to suspect an essentially identical definition of "new nonroad vehicle" will nullify the nonroad preemption scheme either.[39]
 
 
 27
 EMA's reliance on the legislative history fares no better. The House bill contained a preemption provision; the Senate bill did not. The conference produced a version of preemption that was quite different from the one the House had passed. EMA's most promising reference is to an excerpt from a House committee report on the House bill that reads:Section 209 of the Act is amended to provide that no State or political subdivision shall adopt or enforce standards relating to the control of emissions from new nonroad vehicles subject to regulations under this Act. This preemption does not apply to existing nonroad vehicles or engines.
 
 
 28
 H.R.Rep. No. 409, 101st Cong., 2d Sess., pt. 1, at 310 (1990). In this paragraph, the House committee appears to consider "new" to be the opposite of "existing," which argues for EMA's date-certain definition. Nor would this be unprecedented; as discussed, § 111 adopts the same new/existing dichotomy regarding stationary sources. Nonetheless, this isolated pair of sentences out of a mass of legislative history is insufficient to bar the EPA's interpretation, especially because it was written before the conferees substantially altered the preemption language in the House bill as part of a compromise with the Senate bill that contained no preemption. EMA also refers to letters from Congressmen to the EPA Administrator during the rulemaking, in which the Congressmen purport to explain Congress's intent at the time of the amendment. Even EMA concedes that such post-enactment statements cannot be used to change Congressional intent that is not announced at the time of enactment. See Bread Political Action Comm. v. FEC, 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 1238 n. 3, 71 L.Ed.2d 432 (1982); Regional Rail Reorg. Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974). At best, these are statements that the EPA could take into account in deciding on a reasonable interpretation of the statute, and the EPA explicitly addressed the Congressmen's comments in the final rule.[40]
 
 
 29
 For all of EMA's efforts, the statute does not foreclose the EPA at Chevron step one. At Chevron step two, there may be room for differing views of the statutory language and legislative history, but the EPA was within the bounds of permissible construction in analogizing § 209(e) on nonroad sources to § 209(a) on motor vehicles. EMA cannot show that the EPA's decision to harmonize §§ 209, 213, and 216 by interpreting "new" consistently throughout all three sections was impermissible. See 56 Fed.Reg. at 45,867. Congress could have chosen a different scheme for nonroad sources, but in the absence of any indication in the statute or the legislative history that it did, EMA's failure to explain why nonroad engines are in some relevant respect different from motor vehicles undercuts any claim that the EPA's interpretation of "new" is impermissible.
 
 
 30
 2. Implied preemption in § 209(e)(2). Section 209(e)(2) does not expressly preempt any state regulation. The parties agree, however, that it does imply a preemption. Subsection (A) permits the EPA to authorize California to adopt emissions standards and requirements for nonroad sources not mentioned in § 209(e)(1). Subsection (B) permits other states to opt in to already approved California regulations. Obviously, if no state regulation were preempted, California would have no need to seek authorization for its regulations, and other states would not need to opt in to the California rules. Thus, the California authorization provision assumes the existence of a category of sources that are subject to preemption. See Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (state law impliedly preempted where obligations imposed by federal statute "reveal a purpose to preclude state authority"). In other words, states must be preempted from adopting any regulation for which California could receive authorization. The issue is whether, as the EPA decided, only new nonroad sources are covered by § 209(e)(2), or, as EMA argues, both new and non-new sources are covered.
 
 
 31
 EMA contends that by limiting the preemption to new nonroad engines and vehicles, the EPA violated § 209(e)(2)'s plain statement that California may seek authorization to regulate "any nonroad vehicles or engines other than those referred to" in § 209(e)(1). In effect, EMA maintains, the EPA has amended the statute to read: "any new nonroad vehicles or engines other than those referred to" in § 209(e)(1). Section 209(e)(1) expressly preempts state standards for emissions "from either of the following new nonroad engines or nonroad vehicles." EMA argues that Congress, after defining the two categories in § 209(e)(1) as "new," must be presumed to have acted intentionally in omitting "new" from § 209(e)(2).
 
 
 32
 The EPA first contends that because § 209(e)(2) does not mention preemption at all, it is necessarily silent as to the scope of the implied preemption, and, therefore, the court must proceed to Chevron step two. The question at step one, however, is whether "the intent of Congress is clear ... for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781. To determine Congressional intent, we must use "traditional tools of statutory construction." Id. at 843 n. 9, 104 S.Ct. at 2782 n. 9. The most traditional tool, of course, is to read the text; if it clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is "silent" in the Chevron sense. Ethyl Corp., 51 F.3d at 1060. That is the situation in the instant case. As all parties recognize, the authorization regime makes sense only if all states are preempted from adopting regulations for which California may seek authorization. It is clear from the text and structure of the statute, therefore, that Congress intended to preempt state regulation, and it is equally clear that it intended the scope of preemption to be the same as the scope of permissible authorization. The EPA's own analysis of the statute is that the implied preemption must go "hand-in-hand" with the authorization scheme in § 209(e)(2). If the scope of the authorization regime is clear in the statute, the scope of the implied preemption can be resolved at Chevron step one. Hence, we must reject the EPA's argument that the statute is silent on this issue and turn instead to its analysis of the oddity that would result from EMA's reading of the statutory language.[41]
 
 
 33
 As we do so, it is important to understand the limitations of an argument based on the supposed "oddity" of plain statutory language. "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " United States v. Ron Pair Enterp., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Thus, if apparently plain language compels an "odd result," the court may refer to evidence of legislative intent other than the text itself, such as the legislative history. Public Citizen v. U.S. Department of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989) (quoting Green v. Bock Laundry Machine Co., 490 U.S. 504, 509, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989)). While literal interpretation need not rise to the level of "absurdity" before recourse is taken to the legislative history, however, id. at 453 n. 9, 109 S.Ct. at 2567 n. 9, there must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning. In the absence of such evidence, the court cannot ignore the text by assuming that if the statute seems odd to us, i.e., the statute is not as we would have predicted beforehand that Congress would write it, it could be the product only of oversight, imprecision, or drafting error. Put otherwise, the court's role is not to "correct" the text so that it better serves the statute's purposes, for it is the function of the political branches not only to define the goals but also to choose the means for reaching them. See Consolidated Rail Corp. v. United States, 896 F.2d 574, 579 (D.C.Cir.1990). Nor, under Chevron, may an agency avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy. Therefore, for the EPA to avoid a literal interpretation at Chevron step one, it must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it.[42]
 
 
 34
 The EPA's strongest arguments arise from an apparent tension between two aspects of the authorization regime. The Administrator may authorize California to adopt standards and other requirements "if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." CAA, § 209(e)(2)(A), 42 U.S.C. § 7543 (1994). Because § 213(a) authorizes the EPA to regulate only new nonroad engines and vehicles, if California must seek EPA authorization when regulating non-new engines and vehicles, there will apparently be no "applicable Federal standards" to compare with the California regulations. From this the EPA makes two arguments: first, because there will be no federal standards in such a case, the statute does not provide any basis for the EPA to determine whether to authorize a proposed California regulation; and second, because the EPA cannot regulate non-new engines and vehicles, Congress could not have intended also to preempt the states from regulating such engines and vehicles, leaving major pollution sources unregulated by anyone.
 
 
 35
 As to the EPA's first argument, EMA points out that it is possible for the EPA to review proposed California standards under the statutory criteria even when there are no comparable federal regulations. EMA maintains that when there are no applicable federal standards, California's regulation will necessarily be "as protective of public health and welfare," and therefore the first requirement of § 209(e)(2)(A) will be satisfied.[43] Further, the EPA's review will be more than pro forma because subsection (A) requires the Administrator to determine whether California needs to adopt the regulation to meet compelling and extraordinary conditions and whether the California regulation is consistent with § 209 of the CAA. The latter requirement in particular can be seen as an important part of the overall preemption scheme. While § 209(e)(1) prevents any state--including California--from adopting standards relating to emissions from two categories of nonroad sources, the EPA recognized in its rulemaking that standards purporting to apply only to non-new sources might "relate back" to the original manufacturer and thus effectively apply to new sources. While the EPA hopes that courts will apply the Allway Taxi rule to void such improper state regulation, the statute gives EPA the chance to do so itself. If the EPA must review proposed California standards for non-new sources in the two § 209(e)(1) categories for compliance with § 209, then the EPA can apply its expertise to determine whether the standards violate Allway Taxi, rather than depending on the courts to sort it out post hoc. It is therefore conceivable that Congress meant to require California to come to the EPA before regulating sources not within the EPA's own regulatory authority.[44]
 
 
 36
 Nor does the "regulatory gap" cited by the EPA show that a literal reading of the statute is "demonstrably at odds" with Congressional intent. First, the gap is illusory, for the statute does not exempt any class of nonroad sources from regulation. The EPA has sole authority over the classes of new nonroad sources defined in § 209(e)(1). The EPA and California have joint authority over all other new nonroad sources. On this much, all parties agree. The dispute is whether all states have independent authority to regulate non-new sources, or whether California has sole authority over such sources, with other states permitted to opt in to California regulations. Thus, the question is not whether the statute leaves some sources unregulated, but rather whether it permits up to 50 different sets of regulation or requires uniformity. Moreover, under the EPA's interpretation, even if states other than California are preempted from independently adopting emissions standards for non-new sources, each state can still adopt its own in-use regulations. See infra Part II B 3. So far as we can tell, the supposed "gap" created by a literal interpretation turns out to be not really a gap at all, and in light of the permitted in-use regulations, not a particularly large one in any event.[45]
 
 
 37
 Given the indications before Congress that California's regulatory proposals for nonroad sources were ahead of the EPA's development of its own proposals and the Congressional history of permitting California to enjoy coordinate regulatory authority over mobile sources with the EPA, the decision to identify California as the lead state is comprehensible. California has served for almost 30 years as a "laboratory" for motor vehicle regulation. See MEMA, 627 F.2d at 1110. Its severe air pollution problems, diverse industrial and agricultural base, and variety of climatic and geographical conditions suit it well for a similar role with respect to nonroad sources. As was the case when Congress first regulated motor vehicle emissions, California was already in the lead on nonroad sources in 1990.[46] It is true that California has never enjoyed sole authority over any aspect of motor vehicle emissions control. Instead, in any area in which other states are preempted from acting, California and the EPA each have regulatory authority.[47] To that extent, § 209(e), read literally, is different.[48] However, simply because Congress has addressed motor vehicle emissions in one fashion does not mean that it could not address nonroad emissions in a slightly different manner. It clearly did depart from the motor vehicle model in at least one respect by preempting even California from adopting standards for particular categories of nonroad sources. Because the text plainly creates another departure with respect to preemption of state regulation of non-new sources, and because there is a plausible explanation for why Congress would have done so, the court cannot assume that Congress really meant to duplicate the motor vehicle regime in all respects.
 
 
 38
 Assuming that the result apparently compelled by the text is sufficient to require recourse to the legislative history, we find the historical record to be of little assistance. As we have previously noted, the Senate bill did not contain any preemption, and this was done intentionally to protect California's efforts to meet its own needs by developing nonroad emission standards, which were already well ahead of the EPA's.[49] The House bill, by contrast, preempted state regulation of all new nonroad sources, with no provision for a California waiver.[50] In conference, the House's express preemption was narrowed to cover only the two categories of new nonroad engines defined in § 209(e)(1), and the California authorization provision was added. The EPA maintains that because the House had limited preemption to new engines and vehicles, and the Senate did not want any preemption at all, it would have been odd for the conference to have impliedly preempted state regulation of non-new engines and vehicles, which neither bill had preempted, especially since the conference report does not mention the subject at all.[51] However, given the clear statutory language, the absence of explanation cuts against the EPA. With such a meager record of what happened in conference, the court is unable to reconstruct the legislative compromises that were made. Even if the final product might strike us as unexpected given the versions passed by each House, the court could not make the leap from such an impression to the certainty that such a result was unintentional. The competing interests--between the two Houses, between manufacturers, state regulators, and environmental groups, and even between Members from different regions and parties--are simply too complex and multifarious to rule out the possibility that the conference settled on the result described by the statutory text. Even this account oversimplifies the matter, as changes in § 209(e) could have been traded for other changes elsewhere in the legislation. In the end, California was protected as the Senate wanted and all other states were preempted in accord with the thrust of the House bill; to say more about the conference is to speculate.
 
 
 39
 There are, in fact, only a few scattered pieces of evidence about what the conferees intended, or what the members of both Houses thought they were voting for when the bill emerged from conference. In the end-of-session haste in which this huge bill was passed,[52] the conference committee did not produce a section-by-section analysis of the conference bill.[53] Senators Chafee and Baucus, who were among the Senate managers, placed their explanation of five titles of the 1990 Amendments in the Congressional Record, but it largely paraphrases the statutory language.[54] In remarks on the Senate floor, both Senators stated that the only engines that the states were preempted from regulating were those covered bys 209(e)(1). According to Senator Chafee, "States retain their existing authority to regulate all remaining new nonroad engines or vehicles."[55] Senator Baucus, after describing the two categories preempted in § 209(e)(1), said: "The preemption is limited only to these categories of nonroad vehicles; states retain all of their existing authority to fully regulate all other types of new nonroad equipment."[56] These statements could be viewed as consistent with the EPA's position only if the Senators are understood to be advising their colleagues that the preemption for nonroad sources is no different, except for § 209(e)(1), than that for motor vehicles. A perhaps more plausible reading, however, would contradict the EPA's position (without supporting EMA's position) insofar as the Senators appeared to convey the impression that the only preemption in § 209(e) was the express preemption in § 209(e)(1).
 
 
 40
 The EPA also relies on a memorandum of the staff of the Conference Committee. See supra n. 40. The memorandum notes that all states are preempted from regulating new nonroad sources in the two § 209(e)(1) categories. It goes on to say: "With respect to other covered nonroad sources, California would be permitted to set standards, and other states would be permitted to opt-in to the California standard." (emphasis added). The EPA contends that "covered" here is synonymous with "new," for "covered" must refer to sources covered in § 213, which gives the EPA regulatory authority over only new nonroad sources. The memorandum cannot carry the day for the EPA. First, a staff memorandum is hardly authoritative. Second, it is unclear that "covered" can only be understood to mean "new" because it could just as easily refer to the scope of the bill's definition of "nonroad engine" and "nonroad vehicle." Clear statutory text cannot be trumped by an ambiguous phrase from a document that was not promulgated by a single Member of Congress, let alone adopted by a committee or Congress as a whole.
 
 
 41
 In sum, the legislative history is unhelpful. In determining what the members of Congress intended to vote for, the legislative history provides no basis for the court to conclude that they voted for a regulatory scheme other than that provided by the words in the statute. The haste and confusion attendant upon the passage of this massive bill do not license the court to rewrite it; rather, they are all the more reason for us to hew to the statutory text because there is no coherent alternative intention to be gleaned from the historical record. "In such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." Ron Pair, 489 U.S. at 240-41, 109 S.Ct. at 1030 (construing Bankruptcy Code of 1978); see also id. at 243 n. 6, 109 S.Ct. at 1031 n. 6 (declining to depart from text where legislative history was almost silent on provision at issue). Essentially, the EPA concludes that the conferees inadvertently left out the word "new" in § 209(e)(2), and the EPA is, in fact, adhering to what was intended.[57] Without a showing that the text is "demonstrably at odds" with Congressional intent, much less that the regulatory scheme is unworkable or absurd, however, the court must take Congress at its word. We therefore conclude that the EPA's interpretation of § 209(e)(2) is forbidden at Chevron step one.
 
 
 42
 3. In-use regulations. Once it has been established which nonroad sources the states are preempted from regulating, the question remains what sorts of regulations the states are preempted from adopting. The EMA petitions challenge the permissibility of the EPA's decision that in-use regulations are neither "standards [nor] other requirements relating to the control of emissions." CAA, § 209(e)(1), (e)(2)(A). Looking to the statutory language, EMA maintains that in-use regulations are clearly "other requirements," and the statute neither modifies the term "requirements" nor mentions anything about in-use regulations. The dispute largely concerns the relationship of the preexisting subsections (a) through (d) of § 209 to new subsection (e). The phrase "standard or other requirement" does not appear in the earlier subsections, but the words "standard" and "require" or "requirement" do appear several times. The court has previously approved the EPA's interpretation of "standard" in § 209(a) to mean quantitative levels of emissions, MEMA, 627 F.2d at 1112-13, and EMA does not challenge that interpretation. Because in-use regulations are not "standards," the question is whether the EPA has properly determined that they are also not "other requirements."
 
 
 43
 Some form of the word "require" appears in both § 209(a) and § 209(c):
 
 
 44
 (a) Prohibition
 
 
 45
 ... No state shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.
 
 
 46
 * * * * * *
 
 
 47
 (c) Certification of vehicle parts or engine parts
 
 
 48
 ... no State or political subdivision thereof shall adopt or attempt to enforce any standard or any requirement of certification, inspection, or approval which relates to motor vehicle emissions.
 
 
 49
 42 U.S.C. § 7543(a), (c) (1994) (emphasis added). Also, § 209(d) preserves the right of states "otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d) (1994). The EPA contends that the term "requirement" in § 209 must mean "certification, inspection, or approval" requirements of the kind preempted in § 209(a) and (c), and that § 209(d) shows that "requirement" does not include use restrictions.
 
 
 50
 EMA responds that in subsections (a) and (c), Congress expressly modified "require[ment]" with the phrase "certification, inspection, or [ ] approval." In § 209(e), by contrast, Congress referred to "other requirements" without modification. Thus, to give effect to the different language, "requirement" must include more than just certification, inspection, or approval requirements. Subsections (a) and (c) apply only to particular types of requirements listed in the subsections, while subsection (e), with no limiting language, pertains to all types of requirements. However, EMA's argument overlooks another feature of the statutory language that supports the EPA's interpretation. Section 209(e)(2)(A) requires the Administrator to authorize California to adopt "standards and other requirements relating to the control of emissions," but § 209(e)(2)(B) permits other states to adopt "standards" if "such standards and implementation and enforcement are identical" to California's. This suggests that the "other requirements" that states are preempted from adopting are, as in the motor vehicle preemption regime, limited to ancillary enforcement mechanisms such as certificates and inspections. Though the text does not compel the EPA's interpretation, it does not forbid it either.
 
 
 51
 The parties also wrangle over the significance of § 213(d). The 1990 amendment, while giving the EPA the power to regulate emissions from new nonroad engines and vehicles, provided that the enforcement provisions previously used for the EPA's motor vehicle emissions standards would also be used for the nonroad engine standards:
 
 
 52
 (d) Enforcement--The standards under this section shall be subject to sections 7525, 7541, 7542 and 7543 of this title [CAA §§ 206, 207, 208, and 209], with such modifications of the applicable regulations implementing such sections as the Administrator deems appropriate, and shall be enforced in the same manner as standards prescribed under section 7521 of this title [CAA § 202]....
 
 
 53
 42 U.S.C. § 7547(d) (1994). Neither party provides an entirely satisfactory explanation of how the EPA's standards can be "subject to" § 209, which deals only with the preemption and permissibility of state standards and other requirements. The EPA maintains that the preemption provisions in § 209(a), (c), and (d) apply to the preemption of state regulation of nonroad engines and vehicles. Yet this approach does not explain how the inconsistent preemption regimes of § 209(a-d) and § 209(e) are to be reconciled; it thus begs the question to be answered here. On the other hand, the EPA's position is at least more comprehensible than EMA's, which is that § 213(d) applies § 209 to the EPA's standards. This merely restates the problem, without suggesting a solution. In fact, unfortunately, the statute is unclear with respect to how § 213(d) is supposed to interact with § 209 in general, or with § 209(e) preemption in particular. To give meaning to the § 213(d)'s reference to § 209, there must be some connection, but it is far from apparent what the connection might be. EMA, while criticizing the EPA's interpretation, fails to offer any coherent alternative. Under these circumstances, Chevron deference permits the EPA's interpretation that § 213(d) incorporates into the nonroad regime at least the reservation of the states' right to impose in-use regulations found in § 209(d). This appears to be a reasonable reading of an ambiguous statute, and one that is within the EPA's power to adopt under Chevron.[58]
 
 
 54
 EMA contends that even if the standards of § 209(d) are incorporated by § 213(d), § 209(d) permits only in-use regula tion unrelated to emissions control. However, as the EPA points out, the longstanding scheme of motor vehicle emissions control has always permitted the states to adopt in-use regulations--such as carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles--that are expressly intended to control emissions. See CAA, § 108(f), 42 U.S.C. § 7408(f) (1994) (requiring administrator to make available to state and local authorities information relating to such strategies). Section 209(d) does, therefore, protect the power of states to adopt such in-use regulations.
 
 
 55
 The preemptive language of § 209(e) is broad, but it does not speak directly to the question at hand. The EPA could reasonably conclude that § 213(d) incorporated § 209(d) into the nonroad regime, in which case the specific command of § 209(d) would limit the general language of § 209(e). We therefore defer to the EPA's interpretation under Chevron. Accordingly, we grant the EMA petitions insofar as they challenge the limitation of the implied § 209(e)(2) preemption to new nonroad sources, and otherwise deny them.
 
 III.
 
 56
 NMA challenges three aspects of the EPA's § 213 rulemaking. First, NMA contends that the EPA should have treated surface mining equipment greater than 750 hp as a separate regulatory category, rather than including such equipment among the "construction equipment" or "large compression-ignition engines" categories. Second, NMA contends that the EPA either failed to make the necessary findings under § 213 to permit it to regulate smoke emissions, or that its findings were unsupported by substantial evidence. Finally, NMA maintains that the EPA chose to regulate certain pollutants for the improper purpose of harmonizing federal regulations with those of California and the European Communities.
 
 A.
 
 57
 Background of the NMA Petitions. As required by § 213(a), the EPA undertook a study of pollutant emissions from nonroad engines and vehicles. Although the statute directed the EPA's attention to emissions of volatile organic compounds (VOC), oxides of nitrogen (NO subx ), and carbon monoxide (CO), the EPA also studied other pollutants. The EPA selected 19 ozone[59] and 16 CO nonattainment areas for study. The study found that in the median nonattainment area, nonroad engines produced between 7.3% and 12.6% of all VOC emissions, between 14.5% and 17.3% of all NO subx emissions, and between 5.2% and 9.4% of all CO emissions. Because the statute required the EPA to determine whether nonroad engines significantly contributed to pollution in more than one nonattainment area, the study also disclosed that in the area in which the nonroad contribution was second highest, nonroad engines produced between 11.4% and 18.7% of all VOC emissions, between 29.3% and 31.1% of all NO subx emissions, and between 8.5% and 14.2% of all CO emissions.
 
 
 58
 Based on this study, the EPA published a notice of proposed rulemaking in which it proposed to find that nonroad engines and vehicles contributed "significantly" to ozone and CO nonattainment in more than one nonattainment area.[60] The EPA therefore proposed to regulate NO subx and smoke[61] emissions from all nonroad compression-ignition (CI) engines greater than 50 horsepower.[62] The EPA set the proposed emissions limits based on its projections of manufacturers' costs of compliance.[63] Four categories of large CI engines would be exempt from the regulation, including underground mining engines regulated by the Mining Safety and Health Administration, but not the large surface mining engines at issue here. The EPA declined to propose emissions standards for hydrocarbon (HC), CO, and particulate matter (PM), finding that the available procedures for testing could not accurately predict HC, CO, and PM emissions.[64]
 
 
 59
 The American Mining Congress ("AMC"), which has since merged with another entity to form NMA, filed written comments, supported by a study of mining engine emissions that it had commissioned from the TRC Environmental Corporation. AMC challenged the proposed rule in much the same terms as NMA now challenges the final rule on review. AMC argued that the EPA should either exempt surface mining engines altogether or exempt all nonroad engines greater than 750 hp. Among other objections, AMC contended that the EPA had underestimated the cost of compliance for manufacturers of engines greater than 750 hp, which, it explained, would be much higher than the costs for smaller engines. AMC presented the results of a survey of its members, who predicted cost increases of between 3% and 12%, depending on the size and type of engine. At a meeting in July 1993, the EPA requested more detailed information on the technological steps AMC's members would take to bring mining engines into compliance.
 
 
 60
 In the final rule, the EPA discussed and rejected AMC's contention that surface mining equipment or engines larger than 750 hp should be exempted.[65] The EPA found that construction and mining equipment were similar and could appropriately be considered one category.[66] As to AMC's argument that very large mining engines were unique, both in design and in cost of compliance, the EPA noted that AMC had failed to provide any of the information the EPA had requested on these issues at the July 1993 meeting, and that the only detailed cost information submitted by any manufacturer suggested that the price increase for engines over 750 hp would be approximately one percent.[67] Although the EPA's own analysis of cost and technological issues had not addressed the very large engines, the EPA study had found that the proposed regulation, measured in dollars per ton of reduced NO subx emissions, would be more cost-effective across all regulated nonroad sources than existing regulation of other pollution sources. The EPA also discussed and rejected AMC's contention that it could not regulate smoke emissions,citing both aesthetic harm and the possible harm to health caused by smoke.[68]
 
 
 61
 Although the notice of proposed rulemaking had proposed not to adopt HC, CO, or PM standards because there was no adequate test for such emissions, the final rule included such standards solely for harmonization with standards in California and the European Communities.[69] Many commenters, including health and environmental organizations, state regulatory bodies, engine manufacturers, and equipment manufacturers, had urged the EPA to adopt California's HC, CO, and PM standards, arguing that the "ISO 8178" test mandated by California was sufficiently accurate. Industry representatives advised the EPA that it would lower their costs and improve their competitive position if the EPA harmonized its regulations with those of California and the European Communities, rather than leaving these pollutants unregulated. The European Communities also requested the EPA to consider harmonization with its planned HC, CO, and PM standards. In the final rule, the EPA noted the overwhelming volume of comments urging harmonization and concluded that although the unreliability of the test procedures meant that "it is technically incorrect to claim emission reduction benefits for HC, CO, and PM emissions," the standards would not harm environmental goals.[70]
 
 B.
 
 62
 The NMA Petitions. NMA contends that the EPA exceeded its statutory authority in four respects, two as a result of failing to treat very large engines used in mining equipment as a separate category, one for having inadequate data to support the regulation of smoke emissions, and one for improperly regulating HC, CO, and PM solely to harmonize its regulations with those in other jurisdictions. The EPA contends, however, that NMA is barred from raising this last challenge because neither it nor any other commenter challenged the legitimacy of considering harmonization as a factor in deciding whether to regulate HC, CO, and PM during the notice and comment period. NMA responds that because the EPA originally proposed not to regulate HC, CO, and PM, it had no reason to comment on the EPA's authority to regulate those pollutants.
 
 
 63
 The § 213 rulemaking is governed by § 307(d) ("[o]nly an objection to a rule ... which was raised with reasonable specificity during the period for public comment ... may be raised during judicial review.").[71] The EPA stated in the notice of proposed rulemaking that it did not propose to promulgate standards for emissions of HC, CO, and PM from large CI engines because of its concern about the adequacy of test procedures, but requested comments on the issue. 58 Fed.Reg. at 28,829. Many commenters, both in writing and at the public hearing (at which NMA also appeared), urged the EPA to harmonize its HC, CO, and PM rule with California and Europe. NMA thus knew that the issue was being debated and had an opportunity to argue that the EPA should not accept the other commenters' positions. Moreover, even if it was "impracticable" for NMA to oppose the other commenters during the notice and comment period, it could have raised its objections in a petition for reconsideration. CAA, § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B) (1994). NMA never gave the EPA an opportunity to consider the argument that it advances here: because "harmonization" is not one of the factors that the EPA must consider under § 213, the EPA was barred from regulating emissions for the sole purpose of harmonization. Because no other commenter raised this objection either, and the EPA did not consider the issue sua sponte, we need not decide whether § 307 imposes more stringent requirements than the common law doctrine of administrative exhaustion. See supra Part II B. Under any standard, NMA has failed to preserve this issue for review.
 
 
 64
 We therefore do not reach the merits of NMA's challenge to the HC, CO, and PM standards. As to the other issues raised by NMA, we find that the petitions fail to show that the EPA lacked authority to promulgate the final § 213 rule. Ethyl Corp., 51 F.3d at 1064.
 
 
 65
 1. Whether mining engines cause or contribute to CO and ozone nonattainment. NMA agrees with the EPA's reading of § 213(a)(3): in order to regulate a "class or category" of nonroad engines and vehicles, the EPA must determine that the class or category "causes or contributes to" ozone or CO levels in more than one nonattainment area. NMA challenges the EPA's power to regulate nonroad engines greater than 750 hp that are used in surface mining equipment on two grounds: (1) such engines should have been treated as a separate "class or category," rather than being lumped together either with construction equipment or large compression-ignition ("CI") engines generally; and (2) treating very large mining equipment as a separate category, that category does not cause or contribute to ozone and CO nonattainment because mines are located in rural areas, whereas ozone and CO nonattainment are urban phenomena. The EPA need prevail on only one of these two arguments; NMA does not dispute the EPA's findings that construction equipment, or large CI engines generally, cause or contribute to CO and ozone levels in more than one nonattainment area.
 
 
 66
 The EPA did not act arbitrarily or capriciously in classifying the engines used in very large mining equipment together with construction equipment (in the nonroad study) or large CI engines generally (as a regulatory category in the final rule). NMA contends that nonroad engines greater than 750 hp are used almost exclusively in mining equipment, and that such engines differ from smaller nonroad engines in design and function. When the EPA challenges NMA to explain how the very large engines differ, however, NMA fails to provide an adequate response. First, NMA asserts that it will cost more to modify the very large engines to comply with emissions control regulations. Under § 213(a)(3), however, the EPA must consider compliance costs when setting the level of emissions control once it has made the "cause or contribute" finding, not in deciding whether to regulate at all: "the Administrator shall ... promulgate regulations containing standards applicable to emissions from those classes or categories of new nonroad engines and new nonroad vehicles ... which in the Administrator's judgment cause, or contribute to, such air pollution." (emphasis added). See American Petrol. Inst. v. EPA, 52 F.3d 1113, 1120 (D.C.Cir.1995).
 
 
 67
 NMA also contends that while smaller engines are used in both urban and rural settings, very large engines used in mining equipment are used almost exclusively in rural areas. However, the study commissioned by NMA's predecessor AMC shows that mining equipment is used in 20 nonattainment areas. NMA can characterize the mines as being in "rural" parts of these areas, but the fact remains that more than 6% of VOC and NO subx emitted by mining equipment is discharged into ozone nonattainment areas. Because the statute, on NMA's own reading, requires only that the EPA determine whether a class or category causes or contributes to ozone levels in more than one nonattainment area, it was not arbitrary or capricious for the agency to place very large mining equipment in a category with equipment using similar but smaller engines; nor did the EPA go astray in determining that the "cause or contribute" trigger had been met. NMA would require the EPA to find that the engines cause or contribute to ozone or CO levels in the urban portions of nonattainment areas, but does not ground this requirement in the statutory text, structure, or history.
 
 
 68
 2. Adequacy of consideration of compliance costs. NMA maintains that the EPA grossly underestimated the costs its regulations would impose on manufacturers and users of very large mining engines and equipment. Emissions standards under § 213(a)(3) must
 
 
 69
 achieve the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the engines or vehicles to which such standards apply, giving appropriate consideration to the cost of applying such technology within the period of time available to manufacturers, and to noise, energy, and safety factors associated with the application of such technology.
 
 
 70
 42 U.S.C. § 7547(a)(3) (1994) (emphasis added). The EPA discussed the available technology and estimated compliance costs in the notice of proposed rulemaking. The regulatory support document published at the time of the final rule contained a discussion of the expected technological responses of manufacturers to the standards adopted and revised the cost estimates that had appeared in the notice of proposed rulemaking. For CI engines greater than 750 hp, the EPA estimated that retail prices would rise approximately $100 per 100 hp, and that the retail prices of the equipment in which the engines were used would rise by about one percent.[72]
 
 
 71
 The EPA obviously "considered" costs of compliance; NMA simply maintains that the EPA got its numbers wrong. The EPA gave NMA's predecessor AMC ample opportunity to substantiate that claim during the comment period. AMC presented its members' estimates of much higher costs in adopting the appropriate technologies. The EPA requested more detailed information, but neither AMC nor any of its members provided any.[73] In light of the EPA's detailed analysis of the technology its standards would require, NMA has failed to show that the EPA was arbitrary and capricious in not adopting AMC's estimates as fact.
 
 
 72
 NMA also maintains that the EPA failed to account adequately for the costs imposed by the standards in the form of increased fuel consumption. However, the EPA assumed that for marketing reasons manufacturers would not only adopt emissions-reducing technology, but would also make adjustments to offset the decreases in fuel economy such technology would cause. It then included in its estimate of technology costs the costs of both the emissions-reducing technology and the fuel-consumption-reducing technology.[74] Again, the EPA adequately considered the costs of its regulation.
 
 
 73
 3. Regulation of smoke emissions. Smoke--visible particles emitted by engines--is not mentioned in § 213(a)(3). The EPA therefore adopted smoke standards under § 213(a)(4). If the agency finds that emissions from new nonroad engines and vehicles significantly contribute to air pollution (other than ozone precursors and CO) that "may reasonably be anticipated to endanger public health or welfare," it may regulate classes and categories of new nonroad engines and vehicles that cause or contribute to such emissions. NMA challenges the smoke regulations, arguing that the EPA has inadequately supported its finding that smoke may reasonably be anticipated to endanger public health and welfare.
 
 
 74
 The EPA cited two threats to the public health or welfare from smoke. The first was damage to health resulting from inhalation of particles. The second was smoke's tendency to soil property and people and hamper visibility. For its conclusion regarding health, the EPA relied on Douglas W. Dockery et al., An Association Between Air Pollution and Mortality in Six U.S. Cities, 329 NEW ENG. J. MED. 1753 (1993). That article concluded that "fine-particulate air pollution, or a more complex pollution mixture associated with fine particulate matter, contributes to excess mortality in certain U.S. cities." Id. at 1753. NMA challenges this with two articles published after the rulemaking that criticize the Dockery article.[75] Because these articles were not part of the record presented to the EPA during the rulemaking and NMA did not request reconsideration when the articles had become available, it cannot rely on them here. NRDC v. Thomas, 805 F.2d 410, 438 (D.C.Cir.1986). Although none of the articles establishes as a certainty that smoke harms human health, the statute requires only that the Administrator determine that smoke "may reasonably be anticipated" to endanger public health. In light of the Dockery article, the EPA's conclusion was not arbitrary or capricious. NMA also contends that EPA's reliance on "aesthetic" harms such as reduced visibility and soiled property did not satisfy the statutory requirement of harm to public health and welfare. Under the CAA, "welfare" is defined to include "effects on ... visibility, and ... damage to and deterioration of property." CAA, § 302(h), 42 U.S.C. § 7602(h) (1994). The EPA was therefore within its statutory authority in finding that smoke endangered the public health and welfare.[76]
 
 
 75
 Accordingly, we deny the NMA petitions in their entirety, while we grant the EMA petitions only insofar as they challenge the limitation of the implied § 209(e)(2) preemption to new nonroad sources.
 
 
 76
 TATEL, Circuit Judge, concurring in part and dissenting in part:
 
 
 77
 I concur in all of the court's opinion except its discussion of section 209(e)(2)'s implied preemption of state regulatory authority. Because I do not believe that the record clearly establishes that Congress intended to take the unprecedented step of making the State of California the only government in the nation that may establish emission standards for used offroad equipment, I dissent from Part II B 2 of the court's opinion.
 
 
 78
 I fully agree with the court regarding federal and state authority to establish emission standards for new non-road vehicles and engines--that is, as we hold today, "showroom new" offroad equipment. See Majority op. at 21-24 (Part II B 1). As for non-new--that is, used--offroad equipment, I agree with my colleagues that the EPA lacks authority to establish emission standards. See id. at 26. Our only area of disagreement is over who, if not the EPA, may set emission standards for used offroad equipment. The key issue is whether section 209(e)(2) implicitly preempts states from setting emission standards for used offroad equipment. As the court suggests, the question whether Congress intended section 209(e)(2) to preempt states from setting emission standards for used offroad engines turns on--indeed, it is essentially the same as--whether Congress intended section 209(e)(2) to apply to used offroad equipment. See Majority op. at 25.
 
 
 79
 The EPA interprets section 209(e)(2) as not reaching used offroad equipment at all. 59 Fed.Reg. 36,969 at 36,973-74 (1994). According to the EPA, therefore, states retain their historic authority to set emission standards for used offroad equipment. In contrast, the court finds that section 209(e)(2) applies to used offroad equipment, thereby preempting states from setting emission standards unless California and the EPA approve the standards under the two-stage review process established by section 209(e)(2). Under the first stage, California may adopt the standards only if they are "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(e)(2)(A) (1994). To survive second stage review, the EPA must conclude that California's determination was not "arbitrary or capricious," that California needs the proposed standards to meet "compelling and extraordinary conditions," and that the standards are "consistent" with the other requirements of section 209 of the Act. 42 U.S.C. § 7543(e)(2)(A)(i)-(iii). California and other states may then implement those standards under section 209(e)(2)(B), provided they wait at least two years before doing so. See 42 U.S.C. § 7543(e)(2)(B).
 
 
 80
 Although I agree with the court that we must review the agency's interpretation of section 209(e)(2) under the standards set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I respectfully disagree with the court's approach to ascertaining Congressional intent under Chevron step one. The court's approach in weighing the "plain meaning" of a section of the statute against other evidence of Congressional intent, in my view, goes beyond well-established standards of statutory construction, placing undue weight on the immediate language of a statute to the exclusion of virtually all other evidence. The court dismisses all evidence contradicting the "plain meaning" of statutory language unless each individual piece of evidence demonstrates to a "certainty" that the result implied by a plain reading of the statute is "[in]conceivable," "[in]comprehensible," or "unintentional." Majority op. at 26, 27, 28.
 
 
 81
 Neither the Supreme Court nor we have required that courts give such weight to a piece of text alone. Rather, our overriding obligation under Chevron step one is to determine whether Congress has clearly expressed its intent. Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. In so doing, we must consider the evidence " 'holistic[ally]'." United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) (quoting United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988)). While the immediate statutory text is the most persuasive evidence of that intent, United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940), "[o]ver and over" the Supreme Court has "stressed that ... [courts] 'must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " United States Nat'l Bank of Oregon, 508 U.S. at 455, 113 S.Ct. at 2182 (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850)). We may depart from the literal meaning if it would produce either an "odd result," Green v. Bock Laundry Machine Co., 490 U.S. 504, 509, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989), or "an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' " American Trucking Ass'ns, 310 U.S. at 543, 60 S.Ct. at 1064 (quoting Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199 (1922)). Relying exclusively on a single piece of text is particularly inappropriate where, as here, we inquire into the scope of an implied preemption, thus beginning from the proposition that the statute on its face does not explicitly resolve the issue, see Barnett Bank v. Nelson, --- U.S. ----, ---- - ----, 116 S.Ct. 1103, 1107-08, 134 L.Ed.2d 237 (1996). In such cases, courts have unhesitatingly given weight to the purpose, structure, and legislative history of the statute. See, e.g., Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 606, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991); California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 592, 107 S.Ct. 1419, 1430, 94 L.Ed.2d 577 (1987); Illinois Commerce Comm'n v. ICC, 879 F.2d 917, 926 (D.C.Cir.1989); California v. FCC, 798 F.2d 1515, 1519-20 (D.C.Cir.1986).
 
 
 82
 Applying these principles, I would defer to the EPA's interpretation of section 209(e)(2) as not preempting state regulation of used offroad equipment. I begin with the text. The opening phrase of section 209(e)(2)--stating that the section applies to "any nonroad vehicles or engines other than those referred to in" section 209(e)(1)--does indeed suggest that Congress intended section 209(e)(2) to apply not only to new offroad equipment not covered by section 209(e)(1), but also to used offroad equipment. If this were all the statute said on the subject and if no countervailing evidence existed, I would agree with the court that this language establishes that Congress intended to preempt states from setting emission standards for used offroad equipment. But there is considerable evidence to the contrary, evidence that I believe demonstrates that Congress did not intend to preempt state authority to regulate used offroad equipment.
 
 
 83
 First, interpreting section 209(e)(2) to apply to used offroad equipment makes little sense in light of section 209(e)(2)(A), which allows California to adopt emission standards only "if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(e)(2)(A). Because the EPA lacks authority to establish emission standards for used offroad equipment, there are no "applicable federal standards."
 
 
 84
 In explaining why Congress would have required California to compare its standards to non-existent federal standards, the court seems to rely on petitioner's argument that because the California standards will "necessarily be 'as protective of public health and welfare' " as the absent federal standards, California can rationally compare the two. Majority op. at 26. While I suppose California could theoretically compare its standards with nothing, the court's reading nonetheless leaves us with a provision that has no practical effect in regard to used offroad equipment. Because California's standards for used offroad equipment will "necessarily be 'as protective of public health and welfare' " as the nonexistent federal standards, id. (emphasis added), California's review of emission standards--and the EPA's subsequent review to determine whether California's conclusions were arbitrary and capricious, see 42 U.S.C. § 7543(e)(2)(A)(i)--would serve no purpose at all in regard to used offroad equipment. Cf. Ratzlaf v. United States, 510 U.S. 135, 140-141, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994) (noting that courts "should hesitate" to adopt interpretations that would render other provisions of a statute superfluous or unnecessary).
 
 
 85
 Second, the court's interpretation leaves a regulatory gap that undermines the statute's purpose of reducing air pollution. The court's interpretation of section 209(e)(2) indisputably deprives forty-nine states of authority to set their own emission standards for used offroad equipment. If, for example, Florida wants to establish emission standards for air boats used in the Everglades, it cannot do so itself. Nor can it ask the EPA to set emission standards. Instead, it must ask California for assistance.
 
 
 86
 According to the court, any regulatory gap is "illusory" because California can still set emission standards and all fifty states may establish "in-use" regulations to control pollution from used offroad equipment. See Majority op. at 27. Yet California standards hardly substitute for state emission standards. California, for example, is under no legal obligation to adopt emission standards to help Florida regulate airboats. Nor is California likely to have an interest in Florida's air quality. Even if California decides to adopt emission standards for air boats, there is no assurance that its standards would be appropriate for Florida or any other state. Moreover, California's authority to set emission standards is limited: The EPA can only approve California emission standards if "California ... need[s] such ... standards to meet compelling and extraordinary conditions," 42 U.S.C. § 7543(e)(2)(A)(ii) (emphasis added). If a particular kind of used air boat is not found in California (after all, California has no Everglades), or if California otherwise does not have a compelling need to regulate that equipment, no federal or state agency in the nation may set emission standards for it.
 
 
 87
 As for in-use regulations, the court apparently assumes that such regulations--which control the use, operation, or movement of offroad equipment--are as effective as emission standards in reducing pollution from used offroad equipment. Compared to emission standards, however, enforcing regulations restricting the actual use of offroad equipment would likely require more extensive on-site monitoring to determine whether, for example, the public is using its airboats at the proper times and places. In any event, Congress regards emission standards as an important weapon in the arsenals of both the federal and state governments in reducing pollution from mobile sources. See 42 U.S.C. § 7410(a)(2)(A) (1994) (requiring each state plan to "include enforceable emission limitations and other control measures ... to meet" federal air quality standards); 42 U.S.C. § 7521(a)(1) (1994) (authorizing federal emission standards for new motor vehicles); § 7547 (authorizing federal emission standards for new offroad equipment). Thus, by eliminating most states' ability to set emission standards for used offroad equipment, the court creates a significant gap in terms of the tools that states may use to control air pollution, a gap not compensated for by either California's emission standards or the states' in-use regulations.
 
 
 88
 Third, the court's reading of section 209(e)(2) is inconsistent with the Act's structure. As the court acknowledges, Congress based its program for regulating offroad equipment on the existing program for regulating motor vehicles, see Majority op. at 16-19, 22-23, explicitly linking the two regimes together, see, e.g., 42 U.S.C. § 7547(d) (subjecting enforcement of federal emission standards for offroad equipment to provisions governing motor vehicles, including 42 U.S.C. §§ 7525, 7541-43). With respect to motor vehicles, the Clean Air Act generally preempts states from setting emission standards for new vehicles, see 42 U.S.C. § 7543(a), a preemption that is coextensive with EPA authority to set emission standards for new vehicles. Yet with respect to offroad equipment, the court's interpretation preempts states from establishing emission standards for both new and used offroad equipment, a preemption that significantly exceeds EPA authority to set standards for new equipment.
 
 
 89
 Under the court's interpretation, California's role under the two preemption schemes also differs dramatically. For new motor vehicles (and new offroad equipment, for that matter), California serves as a "laboratory for innovation," Motor & Equip. Mfrs. Ass'n v. EPA, 627 F.2d 1095, 1111 (D.C.Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980), producing emission standards for new vehicles as an alternative to federal standards. The court gives California a far greater role with respect to used offroad equipment: not an auxiliary laboratory operating alongside the federal regime, but the sole clearinghouse for the nation's emission standards for used offroad equipment.
 
 
 90
 To be sure, Congress did not intend to duplicate exactly California's role under the motor vehicle scheme. See Majority op. at 28. While California may establish emission standards for all new motor vehicles subject to federal standards, see 42 U.S.C. § 7543(b), section 209(e)(1) clearly preempts even California from establishing its own emission standards for certain classes of new offroad equipment subject to federal regulation, see § 7543(e)(1). But that single departure from the motor vehicle model merely restricts California's authority to set emission standards for certain identified classes of offroad equipment, including locomotives and small construction and farm equipment. In contrast, the departure created by the court's interpretation today is different in both type and magnitude, granting California exclusive power to set emission standards for all used offroad equipment.
 
 
 91
 Fourth, if Congress had intended to adopt such an unprecedented regulatory regime, one would think that a Senator, Representative, staff member, agency official, or lobbyist would have made note of the fact and explained what Congress was doing. But the legislative record is entirely devoid of any evidence that Congress meant to preempt states from acting even where the EPA cannot and to make California the national arbiter of emission standards for used offroad equipment. Indeed, the legislative record points in the opposite direction.
 
 
 92
 As the court notes, section 209(e)(2) was hastily added in conference. See Majority op. at 28-29. The House bill preempted state emission standards for new offroad equipment; the Senate bill contained no preemption at all. Thus, neither chamber addressed state regulation of used offroad equipment. See id. at 28. As the EPA observes, the conferees were unlikely to have compromised their views on the regulation of new offroad equipment by going beyond even the House bill to preempt state regulation of used offroad equipment. 59 Fed.Reg. at 36,973.
 
 
 93
 Other evidence reinforces this conclusion. A joint House-Senate staff memorandum presented to the conferees explains that, under section 209(e)(1), "states and local governments would be preempted from regulating new nonroad engines which are smaller than 175 hp used in construction equipment or vehicles or farm equipment or vehicles, as well as new locomotives or new engines used in locomotives." JOINT HOUSE -SENATE STAFF, SUMMARY AGREEMENT ON TITLE II, Mobile Sources at 3 (October 10, 1990). [JA at 5.] The memo then explains the scope of preemption under section 209(e)(2): "With respect to other covered nonroad sources, California would be permitted to set standards, and other States would be permitted to opt-in to the California standard using new provisions analogous to sections 177 and 209 of the current law." Id. (emphasis added). According to the memo, therefore, section 209(e)(2) governs only "other covered" offroad equipment. While "other covered" equipment could conceivably mean something besides "other new" equipment, see Majority op. at 29, that seems the most natural reading. New offroad vehicles and engines, after all, are the only equipment "covered" by federal emission standards; and the memo's analogy to the regulation of motor vehicles bolsters the idea that the conferees intended to preempt only state regulation of "new" offroad equipment. Of course, I agree that a staff memorandum alone cannot trump clear statutory text, see id., but no one suggests that it carry such weight, only that it is consistent with other evidence casting doubt on the court's interpretation. Finally, while Senators Baucus and Chafee may have overstated the narrowness of section 209(e)'s preemption, see Maj. op. at 28-29, their comments suggest that the conferees were concerned only with new offroad equipment and had no intention of broadly preempting states from setting emission standards for used offroad equipment.
 
 
 94
 Fifth, neither petitioner nor the legislative record offers a plausible explanation why Congress would have intentionally applied section 209(e)(2) to used offroad equipment. The court suggests one of its own: Congress acted out of concern that states would otherwise violate the Allway Taxi doctrine--that is, that states might adopt emission standards for used offroad equipment that would, by imposing restrictions on equipment immediately after it is put into use, effectively undermine the uniformity of federal emission standards for new offroad equipment. See Majority op. at 26-27; Allway Taxi, Inc. v. City of New York, 340 F.Supp. 1120, 1124 (S.D.N.Y.) (determining whether section 209(e) preempted municipal regulations applying to motor vehicles used as taxi cabs), aff'd, 468 F.2d 624 (2d Cir.1972). With all respect, I think the court is grasping at straws.
 
 
 95
 Not only is the record barren of any evidence that Congress was concerned about preserving the Allway Taxi rule, but there is not even a reasonable fit between the requirements of section 209(e)(2) and the goal of assuring that state emission standards comply with the Allway Taxi doctrine. While it may make sense for a federal agency to review state emission standards to protect federal turf, that does not explain why Congress would have required California to review and approve state emission standards. Nor would EPA review under section 209(e)(2)(A)(i)-(iii) significantly advance the Allway Taxi doctrine. As demonstrated above, section 209(e)(2)(A)(i), which requires the EPA to review California's determination that state emission standards are "at least as protective of public health and welfare as applicable Federal standards," 42 U.S.C. § 7543(e)(2)(A)(i), is completely superfluous in the context of used offroad equipment. Section 209(e)(2)(A)(ii), requiring that emission standards be ones that California needs to "meet compelling and extraordinary conditions," has nothing to do with preventing states from adopting emission standards that could interfere with federal standards for new offroad equipment. It would prevent states from setting emission standards for used offroad equipment even when manufacturers had completely ceased producing that particular type of equipment, thereby posing no risk of undermining federal standards. And even the provision that the court relies on, section 209(e)(2)(A)(iii), which requires the EPA to review emission standards to ensure that they are "consistent with" section 209, bears at best a tenuous connection to the Allway Taxi doctrine. The EPA's review takes place only if California has first reviewed the proposed state standards, either its own or another state's, and passed them on to the federal government. Because only California's own regulations are likely to reach the EPA, section 209(e)(2)(A)(iii)'s practical effect will be to allow the EPA to stop California from violating the Allway Taxi doctrine. This marginal benefit hardly explains why Congress would have adopted such an unprecedented regulatory regime.
 
 
 96
 Finally, the EPA offers an alternative interpretation of the statute that is simple and logical: Congress intended section 209(e)(2) to apply only to new offroad equipment not covered by section 209(e)(1), but made a clerical mistake in writing section 209(e)(2) to apply to "any" offroad equipment. This view is consistent with the structure of the statute, harmonizing the regulation of offroad equipment with that of motor vehicles. It advances the purpose of the statute, leaving no regulatory gap and allowing states to establish emission standards for used offroad equipment to accomplish their air quality goals. It is supported by the weight of legislative history; indeed, it is perfectly understandable given the haste in which Congress acted.
 
 
 97
 Because the court's reading of a portion of the statute establishes a bizarre and unprecedented regulatory regime that conflicts with other provisions of the text, undermines the statute's purpose and structure, finds no support in the legislative history, and produces a result that serves no apparent legislative purpose, and because a perfectly plausible alternative explanation exists, I think this is one of those "unusual cases" in which we may reject the apparent plain meaning of one portion of the statute's text. Nat'l Bank of Oregon, 508 U.S. at 462, 113 S.Ct. at 2186 (determining that, because the apparently plain meaning was "overwhelm[ed by] evidence from the structure, language, and subject matter of the" statute, Congress made a "scrivener's error"); see also Environmental Defense Fund v. EPA, 82 F.3d 451, 468-69 (D.C.Cir.1996) (rejecting literal application of section 176(c)(1) of the Clean Air Act because it would frustrate Congress' intent and "look[ing] to the EPA for an interpretation of the statute more true to Congress' purpose"). At the very least, the evidence as a whole casts sufficient doubt on Congress' intent that we must conclude that some ambiguity exists as to whether Congress intended section 209(e)(2) to cover used offroad equipment.
 
 
 98
 Having thus found the statute ambiguous, I would consider whether the agency's interpretation is permissible under Chevron step two. As noted above, the EPA's interpretation--that section 209(e)(2) does not preempt state regulation of used offroad equipmentis consistent with the purpose, structure, and legislative history of the statute. Moreover, because we are dealing with an implied preemption, we must " 'assum[e] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " Wisconsin Pub. Intervenor, 501 U.S. at 605, 111 S.Ct. at 2482 (quotingRice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Having concluded under Chevron step one that Congress failed to express clearly its intent that section 209(e)(2) reaches used offroad equipment, I think that the agency has adopted a reasonable--indeed, the only permissible--interpretation of the statute.
 
 
 99
 One final note. The court explains its novel and narrow approach to statutory interpretation by suggesting that if courts were released from the bonds of plain language, they might intrude upon the policy choices properly left to the two political branches. Majority op. at 25-26. Relying on the language of a statute to the practical exclusion of all other evidence may produce a more limited judicial inquiry, but it will not necessarily result in a more deferential judiciary. In fact, it is the court, relying on the supposed plain language of a statute, that today overrides a decision by one of the two political branches and introduces its views into what would otherwise be an undisturbed dialogue between the executive and legislative branches.
 
 
 100
 Dissenting from Part II B 2 of the court's opinion, I would deny all petitions for review.
 
 
 
 [1]
 1967 Act, § 2 (CAA, § 108(c)(1)), 81 Stat. at 492
 
 
 [2]
 Id
 
 
 [3]
 1970 amendments, § 4(a) (CAA, § 109), 84 Stat. at 1679-80 (codified as amended at 42 U.S.C. § 7409 (1994))
 
 
 [4]
 Id. (CAA, § 110), 84 Stat. at 1680-83 (codified as amended at 42 U.S.C. § 7410 (1994))
 
 
 [5]
 Id. (CAA, § 107(a)), 84 Stat. at 1678 (codified at 42 U.S.C. § 7407(a) (1994))
 
 
 [6]
 E.g., 1970 amendments, § 4(a) (CAA, § 110(a)(2)(F)), 84 Stat. at 1681 (codified as amended at 42 U.S.C. § 7410(a)(2)(F) (1994)); 1977 amendments, § 127(a) (CAA, § 165), 91 Stat. at 735-39 (codified at 42 U.S.C. § 7475 (1994))
 
 
 [7]
 E.g., 1977 amendments, § 108(a)(1) (CAA, § 110(a)(2)(I)), 91 Stat. at 694. See also Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 848-51, 104 S.Ct. 2778, 2784-86, 81 L.Ed.2d 694 (1984); Citizens Against the Refinery's Effects Inc. v. U.S. EPA, 643 F.2d 183 (4th Cir.1981)
 
 
 [8]
 Section 209(a) provides:
 No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part [CAA Title II, Part A]. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.
 42 U.S.C. § 7543(a) (1994).
 
 
 [9]
 Section 209(b)(1) provides:
 The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that--
 (A) the determination of the State is arbitrary and capricious,
 (B) such State does not need such State standards to meet compelling and extraordinary conditions, or
 (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title [CAA § 202(a) ].
 42 U.S.C. § 7543(b)(1) (1994). California is the only state that qualifies for the waiver, because it was the only state that had adopted emissions control standards prior to March 30, 1966.
 
 
 [10]
 1977 amendments, § 129(b), 91 Stat. at 750 (CAA, § 177) (codified as amended at 42 U.S.C. § 7507 (1994))
 
 
 [11]
 E.g., 1988 Cal. Stat. ch. 1568 §§ 33-34 (codified as amended at Cal. Health & Safety Code §§ 43013, 43018 (West Supp.1996)); N.Y. Envtl. Conserv. Law § 19-0107(5) (McKinney 1984)
 
 
 [12]
 See, e.g., CAA, § 182, 42 U.S.C. § 7511a (1994)
 
 
 [13]
 CAA, §§ 501-507, 42 U.S.C. §§ 7661-7661f (1994)
 
 
 [14]
 CAA, §§ 401-416, 42 U.S.C. §§ 7651-7651o (1994)
 
 
 [15]
 CAA, § 182(c)(4)
 
 
 [16]
 Section 216(10) provides:
 The term "nonroad engine" means an internal combustion engine (including the fuel system) that is not used in a motor vehicle or a vehicle used solely for competition, or that is not subject to standards promulgated under section 7411 of this title or section 7521 of this title [CAA §§ 111, 202].
 42 U.S.C. § 7550(10) (1994) (amended by Pub.L. No. 101-549, § 223(a), 104 Stat. at 2503).
 
 
 [17]
 Section 216(11) provides:
 The term "nonroad vehicle" means a vehicle that is powered by a nonroad engine and that is not a motor vehicle or a vehicle used solely for competition.
 42 U.S.C. 7550(11) (1994) (amended by Pub.L. No. 101-549, § 223(a), 104 Stat. at 2503).
 
 
 [18]
 CAA, § 216(1), 42 U.S.C. § 7550(1) (1994)
 
 
 [19]
 We use the term "nonroad sources" to encompass both "nonroad engines" and "nonroad vehicles" as they are defined in the CAA
 
 
 [20]
 Section 213(a)(1-4) provides:
 (1) The Administrator shall conduct a study of emissions from nonroad engines and nonroad vehicles (other than locomotives or engines used in locomotives) to determine if such emissions cause, or significantly contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare. Such study shall be completed within 12 months of the date of November 15, 1990.
 (2) After notice and opportunity for public hearing, the Administrator shall determine within 12 months after completion of the study under paragraph (1), based upon the results of such study, whether emissions of carbon monoxide, oxides of nitrogen, and volatile organic compounds from new and existing nonroad engines or nonroad vehicles (other than locomotives or engines used in locomotives) are significant contributors to ozone or carbon monoxide concentrations in more than 1 area which has failed to attain the national ambient air quality standards for ozone or carbon monoxide. Such determination shall be included in the regulations under paragraph (3).
 (3) If the Administrator makes an affirmative determination under paragraph (2) the Administrator shall, within 12 months after completion of the study under paragraph (1), promulgate (and from time to time revise) regulations containing standards applicable to emissions from those classes or categories of new nonroad engines and new nonroad vehicles (other than locomotives or engines used in locomotives) which in the Administrator's judgment cause, or contribute to, such air pollution. Such standards shall achieve the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the engines or vehicles to which such standards apply, giving appropriate consideration to the cost of applying such technology within the period of time available to manufacturers and to noise, energy, and safety factors associated with the application of such technology. In determining what degree of reduction will be available, the Administrator shall first consider standards equivalent in stringency to standards for comparable motor vehicles or engines (if any) regulated under section 7521 of this title [CAA § 202], taking into account the technological feasibility, costs, safety, noise, and energy factors associated with achieving, as appropriate, standards of such stringency and lead time. The regulations shall apply to the useful life of the engines or vehicles (as determined by the Administrator).
 (4) If the Administrator determines that any emissions not referred to in paragraph (2) from new nonroad engines or vehicles significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare, the Administrator may promulgate (and from time to time revise) such regulations as the Administrator deems appropriate containing standards applicable to emissions from those classes or categories of new nonroad engines and new nonroad vehicles (other than locomotives or engines used in locomotives) which in the Administrator's judgment cause, or contribute to, such air pollution, taking into account costs, noise, safety, and energy factors associated with the application of technology which the Administrator determines will be available for the engines and vehicles to which such standards apply. The regulations shall apply to the useful life of the engines or vehicles (as determined by the Administrator).
 42 U.S.C. § 7547(a)(1-4) (1994) (amended by Pub.L. No. 101-549, § 222(a), 104 Stat. at 2500-01).
 
 
 [21]
 Section 209(e)(1) provides:
 No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this chapter--
 (A) New engines which are used in construction equipment or vehicles used in farm equipment or vehicles and which are smaller than 175 horsepower.
 (B) New locomotives or new engines used in locomotives.
 Subsection (b) of this section shall not apply for purposes of this paragraph.
 42 U.S.C. § 7543(e)(1) (1994) (amended by Pub.L. No. 101-549, § 222(b), 104 Stat. at 2502). Subsection (b) is the California waiver provision for the motor vehicle preemption of § 209(a).
 
 
 [22]
 Section 209(e)(2) provides:
 (A) In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such authorization shall be granted if the Administrator finds that--
 (i) the determination of California is arbitrary and capricious,
 (ii) California does not need such California standards to meet compelling and extraordinary conditions, or
 (iii) California standards and accompanying enforcement procedures are not consistent with this section.
 (B) Any State other than California which has plan provisions approved under part D of subchapter I of this chapter [CAA Title I] may adopt and enforce after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines (other than those referred to in subparagraph (A) or (B) of paragraph (1)) and take such other actions as are referred to in subparagraph (A) of this paragraph respecting such vehicles or engines if--
 (i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards authorized by the Administrator under subparagraph (A), and
 (ii) California and such State adopt such standards at least 2 years before commencement of the period for which the standards take effect.
 42 U.S.C. § 7543(e)(2) (1994) (amended by Pub.L. No. 101-549, § 222(b), 104 Stat. at 2502).
 
 
 [23]
 56 Fed.Reg. 45,866, 45,867 (1991)
 
 
 [24]
 Id. at 45,871
 
 
 [25]
 59 Fed Reg. 36,969, 36,971-73 (1994) (codified at 40 C.F.R. § 85.1602 (1995))
 
 
 [26]
 Id. at 36,973 (codified at 40 C.F.R. § 85.1603(d) (1995))
 
 
 [27]
 56 Fed.Reg. at 45,867
 
 
 [28]
 59 Fed.Reg. at 36,973
 
 
 [29]
 The § 209(e) rulemaking is not governed by the special procedural standards of § 307(d). CAA, § 307(d)(1), 42 U.S.C. § 7607(d)(1) (1994). Thus, we analyze EMA's procedural challenge solely under the standards of the Administrative Procedure Act
 
 
 [30]
 59 Fed.Reg. at 36,973-74
 
 
 [31]
 Although the EPA's actions regarding § 213 are subject to review under CAA § 307(d), 42 U.S.C. § 7607(d)(9) (1994), and action regarding the § 209(e) rule is subject to review only under the usual APA standards, 5 U.S.C. § 706 (1994), see supra n. 29, the court has concluded that the standards are essentially the same under either statute. Ethyl Corp., 51 F.3d at 1064
 
 
 [32]
 42 U.S.C. § 7543(a) (1994)
 
 
 [33]
 42 U.S.C. § 7550(3) (1994)
 
 
 [34]
 42 U.S.C. § 7550(1) (1994)
 
 
 [35]
 42 U.S.C. § 7411 (1994)
 
 
 [36]
 42 U.S.C. § 7547(d) (1994)
 
 
 [37]
 42 U.S.C. § 7547(a)(3) (1994)
 
 
 [38]
 Section 111(a)(3) provides, in part, that "[n]othing in subchapter II of this chapter [CAA Title II] relating to nonroad engines shall be construed to apply to stationary internal combustion engines." 42 U.S.C. § 7411(a)(3) (1994). Section 302(z) defines "stationary source" as "any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title [CAA § 216]." 42 U.S.C. § 7602(z) (1994)
 
 
 [39]
 EMA's final argument from the statutory language is that § 177 of the CAA, prohibiting states from adopting regulations that would require a "third vehicle," shows that Allway Taxi was wrongly decided and should not be used as a model for the nonroad source preemption rule. Putting to one side the fact that § 177 applies only to motor vehicles and not to nonroad sources, this simply repeats EMA's argument that the EPA's definition will render the preemption a "nullity." Moreover, as the Second Circuit has pointed out, the third vehicle prohibition in § 177 requires the courts to determine whether a purportedly proper state regulation actually has the effect of requiring a third vehicle--essentially the same analysis undertaken in Allway Taxi, and the same analysis that the EPA says should be applied to state emissions standards for non-new nonroad sources. MVMA, 17 F.3d at 537. Again, the statute does not foreclose the EPA's interpretation
 
 
 [40]
 EMA also relies on an October 10, 1990, Joint House-Senate Staff Memorandum that states:
 States and local governments would be preempted from regulating new nonroad engines which are smaller than 175 hp used in construction equipment or vehicles or farm equipment or vehicles, as well as new locomotives or new engines used in locomotives. With respect to other covered nonroad sources, California would be permitted to set standards, and other States would be permitted to opt-in to the California standard using new provisions analogous to sections 177 and 209 of the current law.
 Bypassing the question of what weight should be accorded a staff memorandum, it is unclear precisely how EMA thinks this memorandum is relevant. The second sentence pertains to § 209(e)(2), not to the definition of "new" in § 209(e)(1). The first sentence, which pertains to § 209(e)(1), simply parrots the statute.
 
 
 [41]
 The EPA couches this analysis as a Chevron step two argument, but we it apply it here to determine whether the statute is ambiguous at step one, for otherwise we need not reach step two
 
 
 [42]
 Unlike the dissent, see Diss. op. at 41, we see no inconsistency between the standard we apply in the instant case and the result in Environmental Defense Fund, Inc. v. EPA, 82 F.3d 451, 467-69 (D.C.Cir.1996). There, the court concluded that a literal application of the text would actually "frustrate" the statute's very purpose, and thus deferred to the EPA's alternative construction. Here, by contrast, the court is dealing with a provision that balances various competing interests--for example, the policy of locally appropriate regulation as against manufacturers' economic interest in uniform regulation--so it is impossible to say that the literal text "frustrates" the purpose of § 209(e). The provision strikes a balance between competing policies, and any adjustment of the balance to favor one policy would inevitably "frustrate" another
 
 
 [43]
 EMA suggests that the EPA itself has adopted this position. In 1990, California sought authorization for emissions standards for utility and lawn and garden equipment engines. The EPA's notice of public hearing on the application proposed to grant authorization, even though there were no federal standards for such engines. 56 Fed.Reg. 45,873, 45,875 (1991). However, the EPA provided a second opportunity for public comment on California's authorization after the EPA proposed federal standards for the same equipment. 59 Fed.Reg. 55,658 (1994). By the time the EPA finally authorized the California standards, 60 Fed.Reg. 37,440 (1995), the EPA's own standards had also been finalized. 60 Fed.Reg. 34,852 (1995). Thus, while the EPA's preliminary proposal to grant California's application suggests that EMA's construction is feasible, we cannot say that the EPA has improperly reversed course in adopting the position it has before this court
 
 
 [44]
 A literal interpretation does not mean that § 209(e)(2)(A)(i) "serve[s] no purpose" or is "superfluous." See Diss. op. at 38. The purpose of that provision is to ensure that California does not undermine federal regulation by adopting more permissive standards. Where there are no federal standards, there is nothing to be undermined. With respect to new nonroad sources, however, the policy of § 209(e)(2)(A)(i) is implicated, and the provision will prevent California from taking a more lax position than the EPA
 
 
 [45]
 Although, as the dissent points out, all states might prefer a completely free hand in regulating emissions from non-new nonroad sources, see Diss. op. at 38-39, it is the nature of federal preemption to restrict the tools available to the states in addressing a particular problem. If the text really created a legislative gap, in the sense of leaving a large class of pollution sources unregulated by any jurisdiction, that might suggest that Congress did not intend a literal interpretation, prohibiting state regulation without providing a regulatory scheme of its own. In § 209(e), however, Congress subjected all nonroad sources to potential emissions regulation by either the EPA, California, or both
 
 
 [46]
 Senator Wilson, as had his predecessor Senator Murphy, expressed California's concern that the federal government's new attention to the subject would jeopardize the state's more advanced program, and he cited three particular California regulations that would be affected by § 209(e). 136 Cong. Rec. S17,237 (daily ed. Oct. 26, 1990)
 
 
 [47]
 See CAA, § 209(a) (preempting states from adopting emissions standards for new motor vehicles); id., § 209(b) (providing California waiver from § 209(a) preemption); id., § 202(a)(1), 42 U.S.C. § 7521(a)(1) (1994) (authorizing EPA to adopt emissions standards for new motor vehicles)
 
 
 [48]
 We do not understand the dissent to suggest that § 209(e) permits California to "review," in the sense of blocking or modifying, regulations adopted by other states. See Diss. op. at 40
 
 
 [49]
 S.Rep. No. 228, 101st Cong., 2d Sess. 105 (1990), reprinted in 1990 U.S.C.C.A.N. 3385, 3490; id. at 645
 
 
 [50]
 H.R.Rep. No. 3030, 101st Cong., 2d Sess. 68 (1990). The House bill provided:
 (e) State Standards.--No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from new nonroad engines or nonroad vehicles subject to regulation under the Act. Subsection (b) shall not apply for purposes of this subsection.
 
 
 [51]
 H.R.Conf.Rep. No. 952, 101st Cong., 2d Sess. 336-38 (1990), reprinted in 1990 U.S.C.C.A.N. 3867, 3868-70
 
 
 [52]
 For an account of the circumstances surrounding the conference committee's work on the 1990 amendments and an analysis of the resulting ambiguities, see RODGERS, supra, § 3.1A, and sources cited therein
 
 
 [53]
 136 Cong. Rec. at S16,933 (daily ed. October 27, 1990)
 
 
 [54]
 See id. at S16,938
 
 
 [55]
 136 Cong. Rec. S17,237 (daily ed. Oct. 26, 1990)
 
 
 [56]
 136 Cong. Rec. S16,976 (daily ed. Oct. 27, 1990)
 
 
 [57]
 Even if the omission of "new" from § 209(e)(2)(A) were an oversight, the EPA's accident theory of statutory interpretation requires elimination of a second oversight as well, in § 209(e)(2)(B), the opt-in provision. That provision permits other states to adopt California's standards for "nonroad vehicles or engines (other than those referred to in [§ 209(e)(1) ] )." Again, under the EPA's interpretation, the word "new" must be added to apparently plain text
 
 
 [58]
 The EPA has two other supporting arguments. First, the EPA relies on the statements of Senators Baucus and Chafee after the conference had amended the preemption provision of the House bill. Senator Chafee said that states "can continue to require existing and in-use nonroad engines to reduce emissions by setting fuel requirements, operational conditions or limits on the use of such equipment." 136 Cong. Rec. at S17,237. Senator Baucus said: "States also fully retain existing authority to regulate emissions from all types of existing or in-use nonroad engines or vehicles by specifying fuel quality specifications, operational modes or characteristics or measures that limit the use of nonroad engines or equipment." Id. at S16,976. These statements support the EPA's position. Second, the EPA maintains that because in-use restrictions are inherently local in character, in that their appropriateness depends on local conditions, it would not make sense for Congress to require all states to follow California's lead on this issue. This, too, tends to support the reasonableness of the EPA's interpretation
 
 
 [59]
 Ozone is formed from reactions among VOC and NO subx in the presence of sunlight, rather than being directly emitted from engines
 
 
 [60]
 58 Fed.Reg. 28,809, 28,811-13 (1993)
 
 
 [61]
 Engines emit particulate matter, mostly carbon, of various sizes. "Smoke" refers to the particles that are large enough to be visible. Smoke reduces visibility and can soil buildings, cars, and even human skin and clothing, although its effect on health is unclear. EPA Draft Reg. Support Doc. at 19 (April 1993)
 
 
 [62]
 58 Fed.Reg. at 28,813-14
 
 
 [63]
 Id. at 28,833-34
 
 
 [64]
 Id. at 28,828-29
 
 
 [65]
 59 Fed.Reg. 31,306, 31,318-19 (1994)
 
 
 [66]
 Id. at 31,319. In the nonroad study, the EPA had divided nonroad sources into ten categories, placing surface mining equipment in the "construction equipment" category. The study found that construction equipment contributed, in the median area, between 0.8% and 1.1% of total VOC emissions (i.e., emissions from all sources, both nonroad and other), between 8.4% and 9.7% of total NO subx emissions, and between 0.4% and 0.6% of all CO emissions. Using two different estimates of the number of construction engines in use, the study concluded that construction engines contributed more than 1% of total VOC emissions in either 5 or 14 of the 19 ozone nonattainment areas, more than 1% of total NO subx emissions in all 19 ozone nonattainment areas under either estimate, and more than 1% of total CO emissions in either 0 or 4 of the 16 CO nonattainment areas. Construction equipment was the single largest contributor of NO subx emissions in 17 of the 19 nonattainment areas. By contrast, CO emissions were relatively evenly distributed across all categories of nonroad equipment
 
 
 [67]
 Id. at 31,319, 31,332-33
 
 
 [68]
 Id. at 31,318
 
 
 [69]
 Id. at 31,317-18
 
 
 [70]
 Id. at 31,318
 
 
 [71]
 42 U.S.C. § 7607(d)(7)(B) (1994)
 
 
 [72]
 59 Fed.Reg. at 31,319
 
 
 [73]
 Id
 
 
 [74]
 Id. at 31,333
 
 
 [75]
 NMA cites Suresh H. Moolgavkar et al., Particulate Air Pollution, Sulfur Dioxide, and Daily Mortality: A Reanalysis of the Steubenville Data, 7 INHALATION TOXICOLOGY 35 (1995) ("the effect of particulates was substantially attenuated when sulfur dioxide was simultaneously included in the regression, and was no longer statistically significant"); and Suresh H. Moolgavkar et al., Air Pollution and Daily Mortality in Philadelphia, 6 EPIDEMIOLOGY 576 (1995)
 
 
 [76]
 NMA also suggests that the EPA acted prematurely in promulgating smoke regulations because the EPA is currently reassessing the particulate matter NAAQS. The EPA points out that all NAAQSs are reevaluated every five years, so there is always one pending in the near future. Also, it does not appear that any commentator raised this issue during the rulemaking or that the EPA considered it. Hence, NMA cannot raise it now. See supra p. 34