# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 17, 2023          Decided July 7, 2023

No. 22-1143

GMS MINE REPAIR,
PETITIONER

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION (MSHA),
RESPONDENTS

———

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

———

*James P. McHugh* argued the cause for petitioner. With him on the briefs was *Christopher D. Pence*.

*Robert S. Wilson*, Attorney, U.S. Department of Labor, argued the cause for respondent Secretary of Labor. With him on the brief was *Emily Toler Scott*, Counsel for Appellate Litigation.

Before: HENDERSON, MILLETT and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: In this petition for review, a mine operator and the Secretary of Labor dispute the meaning of a regulation that governs which safety and health violations are counted as part of an operator's history when that operator violates federal standards and must be assessed penalties. We conclude that the regulation at issue is ambiguous, the Secretary's interpretation is reasonable, and that interpretation is entitled to deference. Therefore, we deny this petition.

**I**

**A**

The Federal Mine Safety and Health Act of 1977 (Mine Act or Act) charges the Secretary of Labor (Secretary) with establishing and enforcing safety and health standards for the operation of the nation's mines. *W. Oilfields Supply Co. v. Sec'y of Labor and Fed. Mine Safety & Health Rev. Comm'n*, 946 F.3d 584, 586 (D.C. Cir. 2020). The Mine Act intended to remedy the shortcomings of two prior laws, the Federal Metal and Non-Metallic Mine Safety Act of 1966 and the Federal Coal Mine Health and Safety Act of 1969. S. REP. NO. 95-181, at 6–9 (1977). As the Senate identified in 1977, these two laws failed to protect miners from hazards, slowed the federal response time to emerging dangers, provided for penalties that were "much too low, and paid much too long after the underlying violation," and created sanctions that were "insufficient to deal with chronic violators." *Id.* at 8.

To address these deficiencies, the Mine Act required the Secretary, through the Department of Labor's Mine Safety and Health Administration (MSHA), to investigate accidents and conduct frequent inspections at mines throughout the calendar year. 30 U.S.C. § 813; *see also Donovan v. Dewey*, 452 U.S. 594, 596 (1981). The Act also authorized the Secretary to

promulgate mandatory standards and issue citations to operators who violate these standards. 30 U.S.C. §§ 811(a), 814(a)–(b) and (d). An independent commission, the Mine Safety and Health Review Commission (the Commission), then assigns an administrative law judge (ALJ) to review contested citations and, where appropriate, impose proposed penalties against operators.[1] 30 U.S.C. §§ 820(a)–(c), 823(d)(1). A five-person board constituting the Commission may, in its discretion, review an ALJ's determination; otherwise, the ALJ's determination becomes the final decision of the Commission. 30 U.S.C. § 823(d)(1).

Ultimately, the penalties assessed by the MSHA must account for, among other things, "the operator's history of previous violations . . . ." 30 U.S.C. § 820(i). The MSHA sets forth how it accounts for this history in Section 100.3(c) of its regulations, which considers violations "in a preceding 15-month period" that "have been paid or finally adjudicated, or have become final orders of the Commission . . . ." 30 C.F.R. § 100.3(c); *see also* III MSHA, Program Policy Manual 97 (June 2012). Since 1982, the practice has been to include the violation "in an operator's history as of the date it becomes final." Criteria and Procedures for Proposed Assessment of Civil Penalties, 72 Fed. Reg. 13,592, 13,604 (Mar. 22, 2007) (Preamble).

**B**

GMS Mine Repair and Maintenance, Inc. (GMS) is a mining contractor that provides "specialized services" to mines

---

[1] An "operator" is "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine." 30 U.S.C. § 802(d).

in North America. Petitioner's Br. iii. GMS provided contract services at the Mountaineer II Mine in West Virginia on April 20 and 27, 2021, during which time the MSHA issued several citations against it. Although GMS stipulated to the "findings of gravity and negligence," it contested the $7,331 proposed penalty. J.A. 75–76. Thereafter, GMS went before an ALJ to dispute the MSHA's method of calculating the penalty, because it disagreed with "what precisely gets counted as the operator's violation history . . . ." J.A. 78.

The Secretary, representing the MSHA, argued that all citations and orders that have become final during the 15-month look-back period are counted toward an operator's history of violations, "regardless of when [the citations or orders] were issued." J.A. 78. In opposition to this view, GMS argued that only violations whose citations or orders were both issued during the look-back period and were finalized during that period could count toward an operator's history of violations. The ALJ deferred to the Secretary's reading, deeming the regulation ambiguous "[o]n its face." J.A. 78.

GMS petitioned the Commission to review the ALJ's determination, and when the Commission did not act, the ALJ's determination became the final decision. Had the Commission accepted GMS's reading, the company's penalties would have been $3,268—roughly half the amount assessed. GMS timely petitioned this Court for review.

**II**

**A**

GMS raises factual arguments that we quickly reject before considering the remainder of its petition. GMS argues that the ALJ "misinterpreted certain material facts" and made

an inappropriate "policy pronouncement" in the underlying decision. Petitioner's Br. 41, 44. These arguments are meritless because the ALJ accurately summarized GMS's position on which violations may be counted in an operator's history of violations, and the ALJ could factor into the analysis a sampling of cases provided by the Secretary that reflected common timelines for resolving penalty contests. J.A. 78–79.

**B**

The Secretary has consistently maintained that violations that become final within the 15-month look-back period are to be included in an operator's history of violations, but GMS's position has been far less stable.[2] At times, GMS alternatively argues for the inclusion of only:

1. Violations that occurred during the preceding 15-month period. *See* Petitioner's Br. 21 ("The language is clear and only refers to violations in the preceding 15 months. There is no reference to violations *before* 15 months as the Secretary assert[s].");

2. Citations that were issued and finalized during the preceding 15-month period. *See* Petitioner's Br. 21 ("Any citation issued more than 15 months prior to the citation in dispute will not count because . . . only the citations issued in the preceding 15 months are part of the

---

[2] "When calculating an operator's violation history for purposes of proposing a penalty amount, the Secretary considers the 15-month period immediately preceding the issue date of the citation/order that is being assessed." J.A. 30.

universe of relevant citations in this first step of the process."); *see also* J.A. 76, ¶ 22; or

3. Violations that occurred and whose citations were issued and finalized during the preceding 15-month period. Oral Arg. Tr. 7:4–9 (agreeing that "violation and citation and finalization . . . [must happen] all within 15 months").

GMS's shifting interpretations might arise from its error of conflating a violation with a citation. It declares, without support, that it is "obvious[] a violation does not become a 'violation' for purposes of [Section 100.3(c)] until a citation is issued." Petitioner's Br. 23. But that is untrue. Violations are the unlawful acts of an operator, while citations are the sanctions that the Secretary imposes as a result of those unlawful acts. *See* 30 U.S.C. § 814(a). These two words describe distinct events that take place at different points in the enforcement process—violations occur before citations are issued.[3]

Notwithstanding the shifting interpretations, we take it that GMS asks for us to adopt its second reading, which is for an operator's history to include only citations that were both

---

[3] At oral argument, GMS continued to misuse these terms, referring to violations as occurring and being issued. *Compare* Oral Arg. Tr. 4:15–18 (asserting that "violation . . . **means an occurrence** under Webster's . . . .") (emphasis added), *with* Oral Arg. Tr. at 22:14–16 ("Nowhere in the Secretary's argument does the Secretary explain where in the regulation it says that you can include **violations that were issued** four years ago.") (emphasis added); *cf.* Petitioner's Br. 23 (referring to "'violations' issued").

issued and finalized during the preceding 15-month period. This reading reflects GMS's most consistent position. Unlike the other interpretations, GMS made this argument before the ALJ as well as in its briefs in support of its petition. Moreover, GMS equates a violation with a citation, which aligns with its second interpretation requiring that a citation be issued and finalized during the look-back period.

## III

Our analysis of Section 100.3(c) is guided by the Supreme Court's opinion in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), which provided clear instructions about how courts are to evaluate agency interpretations of regulations.

First, courts must determine whether the regulation is "genuinely ambiguous" by "exhaust[ing] all the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843, n.9 (1984)). These traditional tools include the "text, structure, history, and purpose of [the] regulation." *Id.* Second, even if a regulation is genuinely ambiguous, "the agency's reading must fall 'within the bounds of reasonable interpretation.'" *Id.* at 2416 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)). To this end, the work that courts do reviewing the text, structure, history, and purpose form the "outer bounds" of what is reasonable. *Id.* Lastly, courts must take a third step and identify the existence of "important markers for . . . [when] deference is . . . appropriate." *Id.* What should persuade a court is the "character and context" of the agency interpretation—namely, the authoritativeness of the position asserted, implication of the agency's substantive expertise, and whether the interpretation reflects the agency's "fair and considered judgment." *Id.* at 2416–17 (quoting

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

For the reasons below, we conclude that Section 100.3(c) is genuinely ambiguous, and the Secretary offers a permissible reading that is also entitled to deference.

**A**

**1**

Of the tools that we must employ, "[t]he most traditional tool, of course, is to read the text[.]" *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996). Section 100.3(c) states, in relevant part:

> 100.3(c) History of Previous Violations
>
> An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history.

An "assessed" violation is one for which the Secretary has formally determined a civil penalty amount. *See* 30 U.S.C. § 820(a)(1).

GMS contends that Section 100.3(c) includes only citations that were both issued within the preceding 15-month period and became final during that period as well. In GMS's view, the first sentence of Section 100.3(c) "clear[ly]" refers to

only citations in the preceding 15 months, because it omits any discussion of citations that may have occurred before this period. Petitioner's Br. 21. Even more, the only qualification appears in the second sentence and restricts the scope of citations to ones that have also been finalized during that period.

Seeing it differently, the Secretary argues that Section 100.3(c) is not as clear as GMS asserts. The Secretary interprets Section 100.3(c) to apply to any violation that becomes final within the relevant 15-month period, regardless of when the violation occurred or when its citation was issued. To the Secretary, the first sentence of Section 100.3(c) establishes the relevant look-back period (15 months), and the second sentence merely clarifies that the field of violations to be considered must have become final during these 15 months.

Between the two, the Secretary has the better argument. Section 100.3(c) speaks of only a look-back period and that the violations to be considered must have become final during that time. The regulation does not spell out the sequencing needed to compute an operator's history (i.e., violation, citation, assessment, final order) and when each thing must occur. This lack of detail makes the regulation susceptible to competing interpretations, as seen in this dispute, which is why, based on the text alone, no single correct reading of the regulation emerges.

**2**

Congress built into the Act a deliberate process for assessing and adjudicating violations; this process takes time to complete. Among its many provisions, the Mine Act permits inspections and investigations, 30 U.S.C. § 813(a); issuance of citations and follow-up orders; *see, e.g.*, *id.* § 814(a)–(b), (d);

procedures for enforcing those citations and orders, *see generally id.* § 815; injunctions, *id.* §§ 818(a)(1)–(2); and judicial review, *see generally id.* § 816. Clearly Congress was aware that each of these steps could take time, which it provided for in various other provisions of the Act. *See, e.g.*, 30 U.S.C. §§ 815, 823.

Despite these provisions, the statutory deadlines contained within them still do not account for the normal hindrances and happenstance that often prolong adjudicatory proceedings. The procedural history of this petition provides a case in point. Roughly two weeks after receiving the briefing schedule from our Court, GMS filed an unopposed motion for an extension of time to file its opening brief. We granted that unopposed motion a few days later. Similarly, GMS requested to reschedule oral argument, and we likewise obliged. These types of scheduling changes are as common during administrative proceedings as they are in courts of law. One can expect that such run-of-the-mill realities might easily push a contest outside of the 15-month timeframe that GMS argues must include all aspects of the process owed before a penalty is imposed.[4]

---

[4] Although we concluded that GMS asks this Court to adopt its second and most consistent reading of the regulation, we pause to comment on GMS's position at oral argument. There, GMS argued that a violation, citation, and final adjudication must all occur within 15 months. Oral Arg. Tr. 7:4–9. As the Commission highlighted, pre-citation investigations can take longer than 15 months to complete. The Upper Big Branch mining disaster on April 5, 2010, cost the lives of twenty-nine miners and remains one of the deadliest mining accidents in recent history. Press Release, U.S. Dep't of Lab., Statement by Sec'y of Lab. Marty Walsh on the Anniversary of the Upper Big Branch Explosion (Apr. 5, 2021), available at

Given the amount of process afforded by the Mine Act, it is difficult to conclude that the process must be completed within 15 months of a citation being issued, or else a prior violation cannot be considered as part of an operator's history. As such, the structure of the Mine Act favors the Secretary's reading, because the Secretary's reading does not restrict the process afforded to a fairly short 15 months.

**3**

The history of the regulation also favors the Secretary's reading. The Preamble reveals that the MSHA "anticipate[d] [the] issue" the Secretary now raises as to GMS's proposed reading: the reading would encourage contests and thwart the Secretary's ability to include violations in an operator's

---

https://perma.cc/R92S-ZD7T (last visited June 26, 2023). The MSHA did not issue contributory citations for this disaster until it released its findings from the extensive investigation on December 6, 2011—twenty months after the disaster occurred. U.S. Dep't of Lab., Proposed Assessment and Statement of Account, 1–2, Att. Narrative Findings for a Special Assessment (Dec. 6, 2011), available at https://perma.cc/QEZ9-EPA4 (last visited June 26, 2023).

Under GMS's reading, operators, such as those who committed the serious violations leading to the Upper Big Branch disaster, would never have their violations counted towards their history, because the Secretary issued the citations after an investigation that required more than 15 months to complete. So, though it might go without saying, GMS's proposed reading could let operators escape accountability for even the most egregious violations of federal mine safety and health standards.

history. *Kisor*, 139 S. Ct. at 2412; *see also* Preamble, 72 Fed. Reg. at 13,604. In 2007, the MSHA explained its intention to continue a longstanding practice of "us[ing] only violations that have become final orders of the Commission" and to include those violations "in an operator's history as of the date [they] become[] final." Preamble, 72 Fed. Reg. at 13,604.

While the 2007 regulation shortened the look-back period from 24 to 15 months, the MSHA remained keen on "retain[ing] the final order language" and a decades-long practice of a violation becoming a part of an operator's history on the date that it became final. *Id.* at 13,604. Understanding this desire, the Secretary's reading of the regulation comports with the regulation's history as it reinforces the importance of finality rather than the lesser concerns—in this instance—of when the violation occurred or when the citations were issued.

**4**

Congress enacted coal mining legislation keeping in mind "its most precious resource—the miner." 30 U.S.C. § 801(a). The 1977 amendments expressly declared that the law intended "to prevent recurring disasters in the mining industry." Fed. Mine Safety and Health Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290 (1977). And to this end, Congress placed the "primary responsibility" on mine operators to prevent unsafe conditions and practices. 30 U.S.C. § 801(e).

GMS's reading might capture some routine violations where the operator pays the proposed penalty, but not contested violations or violations requiring special assessments. J.A. 42–43; *see also* Oral Arg. Tr. 14:23–15:8. These latter violations require longer to finalize, and under GMS's restrictive reading operators could avoid future consequences by prolonging penalty contests. An interpretation leading to this result would

be "insufficient to deal with chronic violators" and could hardly protect miners in the way Congress intended.  S. REP. NO. 95-181, at 8.

**B**

Having reviewed the text, structure, history, and purpose, we can conclude that Section 100.3(c) is genuinely ambiguous. While the structure, history, and purpose favor the Secretary's reading, the text lacks useful detail.  Nevertheless, the Secretary's proposed interpretation falls within the "zone of ambiguity" created by our analysis of the regulation.  *Kisor*, 139 S. Ct. at 2416.

The Secretary's interpretation cares only about when the violation becomes final, which comports with the text.  This interpretation falls within the zone of ambiguity, under which the second sentence (that discusses finality) merely clarifies the first sentence (that establishes the look-back period).  These two sentences say nothing further about when the underlying violation must have occurred or been cited.  Notably, like the regulation, the Secretary's interpretation does not consider when the violation occurred or was cited.  GMS's reading, by contrast, requires us to infer an intention for citations to have been issued during the look-back period in addition to those citations being finalized during that period.  We are not required to accept GMS's reading, nor should we be inclined to infer the presence of terms that fail to make an appearance in the regulation's plain text (here, the "issuance" of a "citation"). *See Newman v. FERC*, 27 F.4th 690, 698–99 (D.C. Cir. 2022) (declining to accept an interpretation that required our Court to infer the word "directly" as part of a regulation's intended meaning).

Equally, the Secretary's reading also comes within the zone of ambiguity considering the structure, history, and purpose. The Secretary's interpretation allows for operators to receive full process before being forced to pay penalties. Yet, it fulfills the purpose of the Act and implementing regulation by holding operators accountable for health and safety failures when determining an operator's history of violations. The Secretary's interpretation is thus reasonable and within our established bounds.

## C

Finally, we decide whether the Secretary's interpretation warrants deference. *Kisor*, 139 S. Ct. at 2414. In other words, we examine "whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416. To do so, the interpretation must be the agency's "authoritative or official position;" "implicate its substantive expertise;" and "reflect [its] 'fair and considered judgment'" rather than evince an afterthought or litigation position. *Id.* at 2416–17 (citation and internal quotation marks omitted). The Secretary's interpretation satisfies these criteria.

First, as the Preamble outlines, the Secretary's interpretation reflects its official and steadfast practice (circa 1982) of including a violation in an operator's history as of the date the violation becomes final. *See Kisor*, 139 S. Ct. at 2416 (citation omitted); *see also* Preamble, 72 Fed. Reg. at 13,604. The Preamble states that the MSHA included the phrase "final orders of the Commission" to clarify its intended continuance of this longstanding practice. Preamble, 72 Fed. Reg. at 13,604. In presenting us with a policy followed for over four decades, the Secretary certainly does not offer a post-hoc rationalization or "convenient litigating position." *Kisor*, 139 S. Ct. at 2417 (quoting *Christopher*, 567 U.S. at 155). GMS

and other operators have been familiar with the Secretary's practice for quite some time.

Second, the subject matter of the regulation is within the Secretary's wheelhouse and implicates the Secretary's expertise. Congress tasked the Secretary with developing regulations for mine safety as well as the methods used to enforce those regulations. As such, imposing penalties for violations and ensuring compliance with federal mine health and safety standards is neither "distan[t] from the agency's ordinary duties," nor does it "fall within the scope of another agency's authority." *Kisor*, 139 S. Ct. at 2417 (first alteration in original, second alteration omitted) (quoting *Arlington*, 569 U.S. at 309). GMS counters that imposing sanctions does not implicate technical expertise because it is a procedural matter, which "[c]ourts deal with . . . far more than executive agencies." Petitioner's Br. 17. But Congress did not give courts the authority to determine when and how to assess mine safety violations. It delegated that authority to the Secretary. *See* 30 U.S.C. § 801 *et seq.* Besides, this may be one instance in which even "more prosaic-seeming questions . . . [still] implicate policy expertise," which lies with the agency. *Kisor*, 139 S. Ct. at 2417.

## IV

For the foregoing reasons, we deny this petition.

*So ordered.*